**REDACTED PUBLIC VERSION**

# 15-2714-cv(L)

**15-2889-cv(XAP), 15-2894-cv(XAP)**

───────────────

## In the United States Court of Appeals for the Second Circuit

───────────────

ANDERSON NEWS, L.L.C.,

*Plaintiff-Counter Defendant-*
*Appellant-Cross Appellee*,

[*caption continued on next page*]

───────────────────────────

**PRINCIPAL AND RESPONSE BRIEF OF**
**TIME INC., TIME/WARNER RETAIL SALES & MARKETING, INC.,**
**AND HEARST COMMUNICATIONS, INC. (AS SUCCESSOR-IN-**
**INTEREST TO HACHETTE FILIPACCHI MEDIA U.S., INC.)**
**[FINAL FORM]**

───────────────────────────

On Appeal and Cross-Appeals from a Judgment of
the United States District Court for the Southern District of New York
The Honorable Paul A. Crotty
No. 09-cv-2227(PAC)

Jonathan R. Donnellan
Eva M. Saketkoo
Hearst Corporation
  Office of General Counsel
    300 West 57th Street, 40th Floor
    New York, NY 10019
    (212) 841-7000

*Attorneys for Appellee-Cross-Appellant*
*Hearst Communications, Inc. (as*
*successor-in-interest to Appellee*
*Hachette Filipacchi Media U.S., Inc.)*

Rowan D. Wilson
Thomas G. Rafferty
Antony L. Ryan
Cravath, Swaine & Moore LLP
  Worldwide Plaza
    825 Eighth Avenue
    New York, NY 10019
    (212) 474-1000

*Attorneys for Appellee-Cross-Appellant*
*Time Inc. and Appellee Time/Warner*
*Retail Sales & Marketing, Inc.*

LLOYD T. WHITAKER, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C.,

*Plaintiff-Appellant*,

v.

AMERICAN MEDIA, INC., TIME INC., HEARST COMMUNICATIONS, INC.,

*Defendants-Counter Claimants-Appellees-Cross Appellants*,

BAUER PUBLISHING CO., LP, CURTIS CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI MEDIA U.S., INC., KABLE DISTRIBUTION SERVICES, INC., RODALE, INC., TIME/WARNER RETAIL SALES & MARKETING, INC.,

*Defendants-Appellees*,

HUDSON NEWS DISTRIBUTORS LLC, THE NEWS GROUP, LP,

*Defendants*,

v.

CHARLES ANDERSON, JR.,

*Counter Defendant-Cross Appellee.*

_____

## CORPORATE DISCLOSURE STATEMENTS

Time/Warner Retail Sales & Marketing, Inc. (now known as Time Inc. Retail) is indirectly wholly owned by Time Inc., a publicly held company. JPMorgan Chase & Co., a publicly held company, owns more than 10% of Time Inc.'s stock.

Hearst Communications, Inc. ("Hearst") is an indirectly wholly owned subsidiary of The Hearst Corporation, a privately held company. No publicly held corporation owns 10% or more of the stock of either Hearst or The Hearst Corporation. (Hearst is a party to this action and appeal only as successor-in-interest to Hachette Filipacchi Media U.S., Inc., which was acquired by Hearst on or about May 31, 2011.)

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS ........................................................i

TABLE OF AUTHORITIES .................................................................... v

CITATION CONVENTIONS .................................................................. viii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT .................................................................6

ISSUES PRESENTED........................................................................7

STATEMENT OF THE CASE..................................................................8

    A.    Anderson News and Anderson Services. .............................................12

    B.    Anderson News and Anderson Services Had a Long History of Financial Losses. ...................................................................13

    C.    Anderson News Was the Only Wholesaler to Consistently Refuse Time's Offer of Lower Prices in Exchange for Better Payment and Service Terms. .............................................................14

    D.    Competition Prevented Anderson News from Raising Prices to Publishers. .................................................................15

    E.    Anderson News Develops Its Plan to Force Supracompetitive Pricing and Terms on Its Suppliers. ...................................................16

        1.    Anderson News solicited ███████████ competitors to raise prices alongside it..........................................................17

        2.    Anderson News obtained commitments from major retailers to boycott any non-compliant publisher. ....................20

        3.    Mr. Anderson also planned, if necessary, to "go dark", shutting down Anderson News' distribution nationwide and TNG's throughout the southeastern United States............21

F.    Anderson News Announced the Seven-Cent Surcharge and the Shift of Inventory Costs. ....................................................22

G.    Co-Conspirator Source Joined in Announcing an Identical Seven-Cent Surcharge—But No Other Wholesaler Followed Suit...................................................................................23

H.    Publishers Responded to Anderson News' Demand in Various Ways, but Very Few Accepted the Terms Outright............................25

I.    Anderson News Obtained Renewed Commitments from Its Retailers To Boycott Any Publisher That Rejected the Price Increase............................................................................29

J.    The Pre-Planned "Going Dark" Plan is Executed...............................30

K.    Mr. Anderson Opted To Shut Down Anderson News Rather Than Continue To Compete in a Business That Had Been Unprofitable for Years. ..........................................................32

L.    TWR Signed Contracts with Anderson News' Competitors on Terms More Favorable to Time and TWR Than What Time and TWR Had Offered Anderson News in the Standstill Proposal..........34

M.    Counter-Claimants-Cross-Appellants Suffered Substantial Losses as a Direct Result of the Group Boycott and Collusive Price Increase. ...................................................................35

N.    Procedural History..............................................................38

SUMMARY OF THE ARGUMENT .....................................................40

STANDARD OF REVIEW ................................................................42

ARGUMENT ...................................................................................43

I.    THE UNDISPUTED EVIDENCE OF RECORD ENTITLED DEFENDANTS TO JUDGMENT. ................................................43

A.    The Undisputed Evidence Before the District Court Establishes that Time, TWR and Hachette Did Not Engage in Any Group Boycott or Concerted Refusal to Deal. .................................45

iii

1.     Anderson News Never Attempted To Do Business with Time, TWR or Hachette On Competitive Terms.......................45

2.     Anderson News Cannot Prove that Defendants Refused To Deal With It on Competitive Terms. ...................................50

B.     The Shut Down of Anderson News and Anderson Services Was the Result of the "Ill-Conceived and Badly Executed Plan" to Force Supracompetitive Terms and Prices Onto Suppliers. ...............56

II.     ANDERSON SERVICES—AS A SUPPLIER TO ANDERSON NEWS WITHOUT ANY BUSINESS RELATIONSHIP WITH DEFENDANTS-APPELLEES—LACKS ANTITRUST STANDING........63

III.     ANDERSON NEWS' AND ANDERSON SERVICES' STATE LAW CLAIMS FAIL. ........................................................................68

IV.     COUNTER-CLAIMANTS-CROSS-APPELLANTS SUFFERED ANTITRUST INJURY AS A RESULT OF MR. ANDERSON AND ANDERSON NEWS' CONSPIRACY TO RAISE PRICES.......................69

CONCLUSION ...................................................................................72

iv

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*A.G.S. Elecs., Ltd. v. B.S.R. (U.S.A.), Ltd.,*
    460 F. Supp. 707 (S.D.N.Y. 1978) ....................................................................64

*AD/SAT v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999) ..............................................................................51, 53

*Am. Tel. & Tel. Co. v. Delta Commc'ns Corp.,*
    590 F.2d 100 (5th Cir. 1979) ..............................................................................46

*Anaren Microwave, Inc. v. Loral Corp.,*
    49 F.3d 62 (2d Cir. 1995) ..............................................................................64, 68

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    732 F. Supp. 2d 389 (S.D.N.Y. 2010), *rev'd,* 680 F.3d 162 (2d Cir. 2012) ..............................................................................................................38

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986).............................................................................................43

*Argus Inc. v. Eastman Kodak Co.,*
    801 F.2d 38 (2d Cir. 1986) ..............................................................................56, 57

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)............................................................................................52

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982)............................................................................................66, 72

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)............................................................................................52, 59, 63

*Byrne v. Rutledge,*
    623 F.3d 46 (2d Cir. 2010) ..............................................................................42

*Clorox Co. v. Sterline Winthrop, Inc.,*
    117 F.3d 50 (2d Cir. 1997) ..............................................................................43

*Crimpers Promotions, Inc. v. Home Box Office, Inc.,*
    724 F.2d 290 (2d Cir. 1983) ..............................................................................66, 67

*Dahl, Inc. v. Roy Cooper Co.*,
    448 F.2d 17 (9th Cir. 1971) ..............................................................47

*Disenos Artisticos E Industriales, S.A. v. Costco Wholesale Corp.*,
    97 F.3d 377 (9th Cir. 1996) ..............................................................67

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*,
    391 U.S. 253 (1968)..........................................................................45

*G.K.A. Beverage Corp. v. Honickman*,
    55 F.3d 762 (2d Cir. 1995) ..........................................................63, 64

*H & B Equip. Co. v. Int'l Harvester Co.*,
    577 F.2d 239 (5th Cir. 1978) ............................................................60

*Hobbs v. County of Westchester*,
    397 F.3d 133 (2d Cir. 2005) ..............................................................68

*Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*,
    510 F.2d 1140 (2d Cir. 1975) ............................................................62

*Int'l Bus. Machines Corp. v. Platform Solutions, Inc.*,
    658 F. Supp. 2d 603 (S.D.N.Y. 2009) ..............................................65

*Interborough News Co. v. Curtis Publ'g Co.*,
    225 F.2d 289 (2d Cir. 1955) ..........................................................54, 55

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
    700 F.2d 785 (2d Cir. 1983) ..............................................................57

*Motorola Mobility LLC v. AU Optronics Corp.*,
    775 F.3d 816 (7th Cir. 2015) ............................................................67

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
    36 F.3d 565 (7th Cir. 1994) ..............................................................56

*In re Publ'n Paper Antitrust Litig.*,
    690 F.3d 51 (2d Cir. 2012) ..........................................................57, 61

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
    660 F.2d 1195 (7th Cir. 1981) ..........................................................51

*Reading Int'l, Inc. v. Oaktree Capital Management, LLC*,
  2007 WL 39301 (S.D.N.Y. 2007)................................................................50, 68

*Royster Drive-In Theatres v. Am. Broad.-Paramount Theatres*,
  268 F.2d 246 (2d Cir. 1959) ......................................................................46

*Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*,
  No. 10 Civ. 3751(DLC), 2010 WL 5392927 (S.D.N.Y. Dec. 29,
  2010) ........................................................................................................65

*Siti-Sites.com v. Verizon Commc'ns, Inc.*,
  428 F. App'x 100 (2d Cir. 2011) ...............................................................63

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)............................................................................47, 48

*Tate v. Pac. Gas & Elec. Co.*,
  230 F. Supp. 2d 1086 (N.D. Cal. 2002)..........................................................51

*Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*,
  454 F. Supp. 2d 62 (E.D.N.Y. 2006) .......................................................62, 63

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  257 F.3d 256 (2d Cir. 2001) ..................................................................51, 59

*Webster Rosewood Corp. v. Schine Chain Theatres*,
  263 F.2d 533 (2d Cir. 1959) ..................................................................45, 50

## Statutes & Rules

Sherman Antitrust Act § 1, 15 U.S.C. § 1 ...............................................38, 46, 68

Clayton Antitrust Act § 4, 15 U.S.C. § 15 ..............................................6, 7, 38, 41

28 U.S.C. § 1291 .............................................................................................6

28 U.S.C. § 1331 .............................................................................................6

28 U.S.C. § 1337(a) .........................................................................................6

28 U.S.C. § 1367 .............................................................................................6

Fed. R. Civ. P. 56(a)........................................................................................42.

# CITATION CONVENTIONS

| | |
|---|---|
| 56.1 ¶ __ | For ¶¶ 1-154, citations to "56.1 ¶ __" refer to the Statement of Undisputed Material Facts in Support of Defendants Time Inc., Time/Warner Retail Sales & Marketing, Inc. and Hearst Communications, Inc.'s Motion for Summary Judgment Against Anderson News, L.L.C. and Plaintiff Anderson News' Response thereto. |
| | For ¶¶ 200-250, citations to "56.1 ¶ __" refer to the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment Against Plaintiff Lloyd Whitaker, as the Assignee Under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C. and Plaintiff Anderson Services' Response thereto. |
| | For ¶¶ 300-346, citations to "56.1 ¶ __" refer to Defendants American Media, Inc. and Distribution Services, Inc.'s Rule 56.1 Statement and Plaintiff Anderson News' Response thereto. |
| | For ¶¶ 400-449, citations to "56.1 ¶ __" refer to the Supplemental Statement of Uncontested Facts Pursuant to Rule 56.1 by Defendant Curtis Circulation Company and Plaintiff Anderson News' Response thereto. |
| Anderson Decl. | Declaration of Charles Anderson, Jr., dated March 9, 2015. |
| Br. __ | Brief of Plaintiffs-Appellants. |
| CA__ | Deferred Confidential Joint Appendix |
| Campbell Decl. | Declaration of John Campbell, dated March 9, 2015. |
| CC 56.1 ¶ __ | Counterclaim-Plaintiffs' Statement of Additional Facts Pursuant to Local Civil Rule 56.1, and Counterclaim-Defendants' Response thereto. |
| Cyrulnik Ex. __ | Exhibits attached to the Declaration of Kevin A. Cyrulnik in Support of Counterclaim-Defendants' Motion for Summary Judgment. |
| Davis Ex. __ | Exhibits attached to the Declaration of Seth Davis in Support of Plaintiff Anderson News, LLC's Opposition to Defendants' Motions for Summary Judgment. |

| | |
|---|---|
| Donnellan Ex. __ | Exhibits attached to the Declaration of Jonathan R. Donnellan In Support of Defendants' Motion for Summary Judgment Against Plaintiff Lloyd Whitaker, as the Assignee Under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C. |
| Durand Ex. __ | Exhibits attached to the Declaration of Jennings F. Durand in Support of Defendant Curtis Circulation Company's Motion for Summary Judgment Against Plaintiff Anderson News, L.L.C. |
| Ex. __ | Exhibits attached to the Declaration of Rachel M. Fritzler in Support of Defendants Time Inc., Time/Warner Retail Sales & Marketing, Inc. and Hearst Communications Inc.'s Motion for Summary Judgment Against Anderson News, L.L.C. |
| JA__ | Deferred Joint Appendix |
| Keyko Ex. __ | Exhibits attached to the Declaration of David G. Keyko in Support of Defendants American Media, Inc. and Distribution Services, Inc.'s Motion for Summary Judgment. |
| Margolskee Ex. __ | Exhibits attached to the Declaration of Daniel P. Margolskee in Opposition to Counterclaim-Defendants' Motion for Summary Judgment. |
| Moskowitz Ex. __ | Exhibits attached to the Declaration of Seth A. Moskowitz in Support of Counterclaim-Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment. |
| News 56.1 Additional Facts ¶ __ | Response of Plaintiff Anderson News, L.L.C. to Rule 56.1 Statement of Time Inc., Time/Warner Retail Sales & Marketing, Inc., and Hearst Communications, Inc. |
| S.D.N.Y. ECF No. | ECF docket entries in *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-cv-2227(PAC) (S.D.N.Y.). |

# INTRODUCTION

The district court, at the outset of its opinion granting summary judgment, highlighted the undisputed facts that supported its decision and are fatal to Anderson News and Anderson Services' appeal:

- "In mid-January 2009, Anderson News, which had been losing money for years, unilaterally decided to raise its prices and shift its inventory costs to publishers and distributors . . . ."

- As part of "its plan, which it had been preparing for some months prior to the mid-January, 2009 announcement to the publishers and distributors", Anderson News had "talked to two large retailers concerning the plan, and had an agreement with these retailers that they would not shift their business to other wholesalers. In other words, the publishers and distributors would have to deal with Anderson, if they wanted their magazines displayed at these large retailers."

- "The publishers were given two weeks to fall in line with Anderson News' new price and cost regime, 'or else'."

- "If the publishers and distributors did not acquiesce . . . Anderson would not accept their single-copy magazines for distribution as of February 1, 2009 [and] Anderson also threatened to exit the business . . . ."

- "Not surprisingly, the target audience saw nothing in Anderson's proposal other than higher prices and greater costs. They rejected the plan, and did so almost immediately. Indeed, only 86 of 1,570 publishers accepted the proposal."

- "Other wholesalers did not raise their fees, nor did they seek to shift inventory expenses."

- "The publishers and distributors chose to do business with the wholesalers that offered lower prices and did not seek to increase inventory costs."

- As part of its plan, Anderson News "also attempted to take advantage of [Anderson Services'] controlling position in ProLogix East by refusing to open its warehouse and make deliveries for Anderson News' competitor, The News Group."

- "Anderson's threat to stop deliveries was enjoined by a federal court in the District of Delaware. When Anderson received notice of the District Court's Order, it chose to go out of business."

(SA1-2.) As the district court recognized, the antitrust laws are meant to foster competition, not to permit an inefficient producer to avoid competition and to compel the acceptance of supracompetitive prices by organizing a boycott to deprive customers of magazines.

Anderson News, a financially troubled company, demanded a very substantial price hike and a shift of $70 million of its inventory costs to magazine publishers. Time and TWR offered Anderson News improved pricing for Time's magazines during a 30-day negotiating period, which Anderson News repeatedly rejected. Time and TWR entered into a distribution agreement with Anderson News' competitor, The News Group ("TNG"), on the same pricing terms that Anderson News had refused. Because Anderson Services and TNG's logistics affiliate were joint-venture partners in two distribution companies, ProLogix (East) and ProLogix (West), TNG could distribute magazines to Anderson News' customers with virtually no disruption, using trucks, drivers, routes and schedules that were already in place.

2

Hachette, a smaller publisher than Time, took a different approach. Hachette rejected the demand on a long-term basis but agreed that, for the more than 780,000 copies of its magazines it shipped to Anderson News for distribution in February, it would pay the seven cents per copy Anderson News had demanded, to ensure its magazines were available at retail. Anderson News, however, did not distribute any of those magazines but instead shut its doors and locked the facilities jointly owned by it and TNG, leaving Hachette (and AMI) no recourse but to sue to reclaim the magazines and attempt to distribute them belatedly.

Unbeknownst to publishers or national distributors, Anderson News put in place a no-lose plan: form a conspiracy among Anderson News' competitors and largest customers to force a price increase on publishers. If it succeeded, Anderson News would become profitable. If it failed, Anderson News would walk away from more than $100 million of unsecured debt owed to publishers.

In late 2008, Anderson News solicited ██████████████ competitors (Source ████████) to join in demanding a price increase, and solicited the two largest retailers of magazines (Wal-Mart and Kroger) to boycott any publisher that refused to accede to Anderson News' terms. When TNG announced ████████████████ it would compete for Anderson News' accounts, Anderson News'

3

undisputed response was not to match TNG's and other wholesalers' prices but instead to implement a contingency plan called "going dark": Anderson News shut down its own operations and used its control of a distribution joint venture to shut down *TNG's* magazine distribution throughout the southeastern United States. Rather than compete against TNG, Anderson News forcibly secured its unwilling participation in the group boycott against publishers.

TNG obtained a federal court order enabling it to resume competition. Charles Anderson, Jr. ("Mr. Anderson"), who ran both Anderson News and Anderson Services, admitted that the federal court order caused the demise of Anderson News: "So by [TNG] being able to force us to open back up, in my opinion, it was game over." Ex. 5 (Anderson Dep.) at 478:12-14 (JA225). When Mr. Anderson understood the court order was imminent, he immediately called "key people, key retailers" and told them "we appreciate your commitment and *because of this temporary restraining order*, we're going to have to liquidate or sell what we can as quickly as we can". *Id.* at 575:8-576:17 (emphasis added) (JA239-40). Without "magazines [to distribute], and forced to allow TNG to service Anderson's retail customers via Prologix East's distribution network, Anderson concluded that it could not continue". (Br. 22-23.)

Anderson News never offered Time, TWR or Hachette terms competitive with those other wholesalers provided. Unable to run a profitable

4

business at market prices, Mr. Anderson formulated a conspiracy to foreclose

competition, then forcibly crippled TNG—the competitor who could replace

Anderson News with a flip of a switch. When those tactics failed, Anderson News

shut down. The antitrust laws and those undisputed facts fully support the district

court's conclusion that:

> "Anderson's claim of injury from a concerted refusal to deal, which forced it out of the business, must be rejected. It is clear its own ill-conceived and badly executed plan led to its downfall. The antitrust laws do not compel any entity to accept a price increase, or assume the burden of a significant cost. This is especially so where there were other wholesalers available who offered lower prices and less expensive terms for handling inventory."

(SA3-4.)

Finally, publishers injured by the anticompetitive tactics of

Mr. Anderson and Anderson News in organizing an unlawful group boycott are

entitled to recover for their injuries. After discovery revealed extensive evidence

of Anderson News' anticompetitive scheme, magazine publishers Time, AMI and

Hearst (as successor-in-interest to Hachette) filed counterclaims against

Mr. Anderson and Anderson News. Mr. Anderson and Anderson News did not

dispute that the evidence raised triable issues that they had orchestrated a group

boycott in order to fix prices. The district court granted summary judgment on

those counterclaims on the ground that Time, AMI and Hearst would have suffered

5

the same injuries had Anderson News gone out of business without forming its conspiracy.  Mr. Anderson and Anderson News never argued that rationale, and the injuries deliberately inflicted on publishers in furtherance of Anderson News' conspiracy differ significantly from the consequences of an orderly winding down of Anderson News.  Here, the scheme Anderson News developed caused the two largest retailers of magazines to boycott Time, Hachette and AMI publications, and the "going dark" plan caused magazines at ProLogix (East) that could have been distributed by TNG to remain locked in warehouses instead of sold.  The resulting lost sales flow directly and intentionally from the anticompetitive conduct of Mr. Anderson and Anderson News and would not have occurred in an ordinary shut down.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs-Appellants' and Counter-Claimants-Cross-Appellants' Clayton Antitrust Act claims, 28 U.S.C. §§ 1331 and 1337(a), and over Plaintiffs-Appellants' pendent state-law claims, *id.* § 1367.  Final judgment was entered on August 25, 2015, resolving all parties' claims.  (SA59-60.)  Counter-Claimants-Cross-Appellants timely cross-appealed on September 14 and 15, 2015.  S.D.N.Y. ECF Nos. 454, 455, 456 (JA2408-19).  This Court has jurisdiction over the appeal and cross-appeals, 28 U.S.C. § 1291.

6

## ISSUES PRESENTED

1.      Whether Plaintiffs-Appellants' group boycott claim fails as a matter of law because of the undisputed facts that (A) Anderson News never attempted to do business with Time, TWR or Hachette on competitive terms and prices and (B) Time, TWR and Hachette never refused to do business with Anderson News on such terms, each of which is a required element of a group-boycott claim.

2.      Whether Anderson News' undisputed decision to refuse the terms its competitors accepted and instead to exit the magazine wholesaling business was the cause of any injury Plaintiffs-Appellants allegedly suffered.

3.      Whether Anderson Services lacks antitrust standing to assert any claim under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, because its alleged injuries were suffered not as a result of any relationship it had with magazine publishers or distributors but derivatively as a mere supplier to Anderson News.

4.      Whether summary judgment was properly granted dismissing Plaintiffs-Appellants' state-law claims for tortious interference and civil conspiracy.

5.     Whether the district court erred in holding that no triable issue existed as to whether Time, Hearst and AMI suffered antitrust injury as a result of the conspiracy Anderson News and Mr. Anderson organized.

## STATEMENT OF THE CASE

Anderson News, L.L.C. ("Anderson News") was a magazine wholesaler; separate companies, including Anderson Services, L.L.C. ("Anderson Services"), delivered those magazines to retailers under contracts they had with Anderson News.  By January 2009, Anderson News and Anderson Services had a long history of losses totaling hundreds of millions of dollars.  In 2003, 2004, 2005 and 2007, Anderson News unsuccessfully sought price increases from publishers and national distributors.

Unable to obtain higher prices unilaterally, Mr. Anderson, Manager of Anderson News, developed an anticompetitive scheme to coerce publishers into paying Anderson News more.  That scheme involved several components:  *First*, Anderson News would demand higher prices and refuse to distribute the magazines of any publisher who did not agree to the price hike.  *Second*, Anderson News solicited ███████████ competitors—Source Interlink Distribution ("Source") ████ ████—to join in making similar demands.  *Third*, Anderson News also solicited the two largest magazine retailers to support the price-fixing scheme by boycotting magazines from wholesalers other than Anderson News.  *Fourth*, Anderson News

knew that the scheme was particularly vulnerable to competition from TNG, because most of Anderson News' and TNG's deliveries to retailers were made on the same schedules and using the same trucks operated by two joint ventures their affiliates owned. Mr. Anderson therefore developed a plan he called "going dark": if necessary, he would shut down not only Anderson News but also ProLogix (East), to block the retail sales of all magazines throughout the southeastern United States not only by Anderson News *but also by its closest competitor TNG*.

Mr. Anderson and Anderson News arranged that scheme well before January 14, 2009, when Mr. Anderson publicly announced the terms of his price increase: Anderson News would require each of its publisher customers to accept in writing (i) a seven-cent surcharge for every magazine it distributed (even if the magazine was unsold and returned by Anderson News for full credit) and (ii) a shift from Anderson News to publishers of the inventory cost of magazines that Anderson News had purchased and delivered to retailers—a change in terms amounting to a $70 million increase in Anderson News' unsecured indebtedness to publishers. If a publisher refused either demand, Anderson News would not deliver that publisher's magazines to retailers after February 1.

Five days later, co-conspirator Source issued its own demand for a seven-cent per-copy surcharge, also effective February 1. ██████████

9

███████████████████████████████████████ on January 23, TNG

publicly stated that it would not seek a surcharge.

Hachette Filipacchi Media U.S., Inc. ("Hachette") rejected the

demand as a permanent solution but agreed to pay the surcharge on a one-time

basis for more than 780,000 magazines that it shipped to Anderson News for

delivery to retailers in February.

Time Inc. ("Time") and its national distributor Time/Warner Retail

Sales & Marketing, Inc. ("TWR") sought to negotiate a deal with Mr. Anderson

that would result in Anderson News' continued distribution of Time magazines.

On January 25, Time and TWR asked Anderson News to maintain the pre-

surcharge-demand status quo for a 30-day negotiating period.  Mr. Anderson

rejected the offer.  On January 27, they made Anderson News another 30-day

"standstill" offer, this time offering Anderson News improved prices for Time's

weekly magazines.  Anderson News rejected the offer.

On January 28, Time and TWR reached a wholesaling agreement with

TNG at the same improved prices that Time had offered Anderson News and that

Anderson News had rejected.  On January 28, TWR notified Anderson News in

writing that Time would no longer provide it with magazines, in light of Anderson

News' announced February 1 deadline and its refusal to negotiate.

10

Even after TNG announced it would compete for Anderson News' business, Mr. Anderson refused to do business with Time, TWR or Hachette on the same terms that TNG accepted. Instead, when Mr. Anderson's February 1 deadline passed without any major magazine publisher acquiescing in his price increase, Mr. Anderson set into motion the "going dark" plan he had mapped out long in advance: he shut down Anderson News and directed the closure of ProLogix (East) so that neither his company nor his competitor, TNG, could deliver magazines. It is undisputed that Mr. Anderson specifically intended to prevent ProLogix (East) from delivering TNG's magazines to retailers—including TNG's preexisting retail customers—as part of his plan to force publishers to capitulate.

On February 9, 2009, the Delaware federal district court ordered ProLogix (East) reopened. Nothing at that point prevented Anderson News from continuing to compete on equal footing against TNG and other wholesalers by offering competitive prices and terms. Yet Anderson News never sought to do business at prices and on terms accepted by its competitors. Instead, when the federal court ordered ProLogix (East) reopened, Mr. Anderson immediately decided to liquidate Anderson News and Anderson Services.

Even though the conspiracy Anderson News hatched ultimately fell apart, it injured Time, AMI and Hachette: magazine sales were lost as a result of

11

Wal-Mart and Kroger's boycott, which Mr. Anderson and Anderson News

organized, and lost when Mr. Anderson caused ProLogix (East) to be closed,

preventing TNG from distributing magazines.  Those injuries would not have

occurred had Mr. Anderson simply announced that he was ceasing operations.

They were the direct, intentional consequences of the price-fixing scheme

Mr. Anderson and Anderson News formulated and executed, and are compensable

under the antitrust laws.

A.    *Anderson News and Anderson Services.*

Anderson News and Anderson Services were Delaware limited

liability companies with separate legal existences.  56.1 ¶ 200 (CA1277).

Anderson News was a wholesaler that purchased magazines from publishers and

sold them to retailers; Anderson News could return all unsold copies for full credit.

56.1 ¶ 26 (CA1430).  Anderson News contracted with Anderson Services to

provide the physical "pick, pack, [and] delivery" services through which

magazines were delivered to, shelved at and picked up from retail locations.  56.1

¶ 27 (CA1430).  Anderson News also contracted for delivery with ProLogix

Distribution Services (East), LLC ("ProLogix (East)"), and ProLogix Distribution

Services (West), LLC ("ProLogix (West)"), which were joint ventures co-owned

by Anderson Services and an affiliate of TNG.  56.1 ¶¶ 36-37, 39 (CA1431-32).

12

As of 2009, Anderson News and Anderson Services were both owned by Brookvale Holdings, LLC, which was owned by Anderson Media Corporation. 56.1 ¶¶ 28, 203 (CA1430, 1277). ███████████████████████ ███████████████████████████████████████ 56.1 ¶ 208 (CA1278-79).

B. *Anderson News and Anderson Services Had a Long History of Financial Losses.*

In the ten fiscal years before the end of fiscal year 2008, Anderson News and Anderson Services' holding company (and its predecessor) had lost approximately $236 million. Ex. 43 at ANEWS0028719; Ex. 48 at ANEWS0141768; Ex. 28 (Maier Dep.) at 161:19-162:11 (JA1393, JA1403, JA506). In each of the fiscal years 2004 through 2008, Anderson News' reported income from continuing operations ranged from ████████████ ████████████████████████████████████████ ██████████████ 56.1 ¶¶ 48-49 (CA1434). Anderson Services reported ██████████████████████████████████████████ ██████. 56.1 ¶ 51 (CA1435.) The Examiner appointed by the U.S. Bankruptcy Court for the District of Delaware determined that Anderson News was balance-sheet insolvent in fiscal years 2005 through 2008. Ex. 46 at 126 (CA324).

As of December 30, 2008, Anderson News lacked sufficient cash to make full payment to all national distributors on the date payment was due and

13

thus "deferred" payment to certain national distributors. Ex. 5 (Anderson Dep.) at 297:15-300:8; Ex. 50 at MBHN00124328-29; Ex. 51 at ANEWS0188779 (JA190, JA1416-17, JA1423).

C.   *Anderson News Was the Only Wholesaler to Consistently Refuse Time's Offer of Lower Prices in Exchange for Better Payment and Service Terms.*

In late 2008, Time began discussions with its wholesalers, including Anderson News, to reduce the price Time charged wholesalers for its weekly magazines by two percent of the cover price in exchange for each wholesaler's acceptance of better payment and service terms. 56.1 ¶¶ 55-56; Ex. 10 (Jacobsen Dep.) at 94:25-96:11 (CA1436, JA445). During the January 14 industry-wide conference call at which Mr. Anderson announced his price demands, he acknowledged that Time offered Anderson News two percentage points of additional discount and that Anderson News had not accepted the offer. Ex. 52 at ANEWS0151821 (JA919). That two-percentage-point price reduction on Time's weekly publications is equal to the improved price every wholesaler besides Anderson News, including Source, accepted for distribution of Time magazines in agreements they entered beginning in January 2009. 56.1 ¶¶ 153-54 (CA1462-63); *see* Section L, *infra*.

14

D.     *Competition Prevented Anderson News from Raising Prices to Publishers.*

In 2003, 2004, 2005 and 2007, Anderson News made unsuccessful unilateral demands for higher prices from its publisher customers. Ex. 5 (Anderson Dep.) at 202:17-218:13; Ex. 27 (Stockard Dep.) at 135:18-23, 226:20-227:2; Ex. 28 (Maier Dep.) at 74:3-12 (JA174-78, JA585, JA593, JA498). In 2003, Anderson News threatened to reduce or eliminate distribution for publishers that refused to pay a per copy surcharge of seven cents in metropolitan areas and four cents elsewhere. Ex. 5 (Anderson Dep.) at 202:13-205:16 (JA174-75). In 2004, Anderson News sought a surcharge of eight cents per magazine in metropolitan areas. Ex. 5 (Anderson Dep.) at 205:17-206:06 (JA175). In 2005, Anderson News asked publishers to pay a fuel surcharge and threatened to impose unilateral "cost and operating adjustments" upon any publisher that refused. Margolskee Ex. 22 at TWRAND00038621 (JA1612). In 2007, Anderson News demanded that national distributors bear the scan-based-trading ("SBT") inventory cost associated with the publishers they represented. Margolskee Ex. 25 at ANEWS0214970 (JA1617). Publishers and national distributors refused each of those demands, and Anderson News withdrew them. CC 56.1 ¶¶ 15-18 (CA2968-69).

Anderson News was particularly vulnerable to competition from TNG, Ex. 5 (Anderson Dep.) at 478:5-17, 480:3-7; Anderson Decl. ¶¶ 10-11

15

(JA225-26, JA2326-27), because Anderson News and TNG shared two joint ventures, ProLogix (East) and ProLogix (West), to handle the actual delivery, merchandising, and returns processing, using the same trucks, drivers, personnel, routes and schedules. 56.1 ¶ 231 (CA1284). Through the ProLogix joint ventures, Anderson News' and TNG's service areas overlapped extensively: over 80% of the retail value of magazines distributed by Anderson News went to retailers in zip codes that were also served by TNG. 56.1 ¶ 44 (CA1433). As a result, if a retailer switched from Anderson News to TNG, it would continue to receive the same magazines, on the same ProLogix truck, with the same ProLogix driver, on the same schedule, and with the same in-store service and returns processing. Anderson Decl. ¶¶ 10-11; CC 56.1 ¶ 34 (JA2326-27, CA2973-74).

After Anderson News' failed inventory cost shift in 2007, a senior Anderson Media executive wrote that he had "learn[ed]" that Anderson News "[c]annot fight everyone" and that "[f]or anyone to invest [in Anderson News] a.) Must see ability to be profitable—*no compete*". Margolskee Ex. 30 at MBHN00098061 (emphasis added) (JA1627). In the same document, the executive asked: "Will national distributors be ready next time?" *Id.* (JA1627).

E. *Anderson News Develops Its Plan to Force Supracompetitive Pricing and Terms on Its Suppliers.*

By the end of 2007, Mr. Anderson and Anderson News began laying plans for the "next time". The terms of its demand would be familiar: a surcharge

16

on each copy distributed and a shift to publishers of a total of $70 million in inventory costs.  Ex. 5 (Anderson Dep.) at 47:7-48:16, 68:9-25; Ex. 52 at ANEWS0151821-22; Ex. 63; Margolskee Ex. 5 (Anderson Dep.) at 70:7-15, 499:5-15; Margolskee Ex. 31 at AMIDSI00002191 (JA140, JA145, JA919-20, JA1448, JA146, JA229, JA1450).  The threat behind the demand, though, was far different.  It involved a boycott by major retailers, concerted action with Anderson News' competitors and a "going dark" plan that allowed Anderson News to shut down substantial magazine deliveries of its competitor TNG, if TNG would not go along.

        1.    Anderson News solicited ███████████ competitors to raise prices alongside it.

Anderson News solicited ████████████ competitors, Source ██████ to raise prices simultaneously to the same level.  Anderson News, Source ██████████ together accounted for the wholesaling of ██% of U.S. single-copy magazine sales by retail value.  (Br. 5.)

████████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

██████████████████████████

17

██████████████████████████████████████████

████████████████████████████

On January 6, 2009, Mr. Clark emailed a group of wholesalers that included multiple Anderson News, Source ████████ executives, and stated that "the publishers and [national distributors] do not have the appropriate sense of urgency to fix this business. *The wholesalers will need to fix this industry unilaterally*." Margolskee Ex. 52 at ANEWS0188179 (emphasis added) (JA1638).

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

18

> 2. Anderson News obtained commitments from major retailers to boycott any non-compliant publisher.

In late 2008, Mr. Anderson and Mr. Stockard of Anderson News met with executives at Wal-Mart and Kroger, which together accounted for approximately ▮▮% of all U.S. single-copy magazine sales by retail value. CC 56.1 ¶¶ 22, 25, 27 (CA2970-72). During those meetings, Mr. Anderson and Mr. Stockard asked Wal-Mart and Kroger to refuse magazines from any other wholesaler at their Anderson News-serviced locations for thirty days if Mr. Anderson executed his "going dark" plan and shut down Anderson News, Anderson Services and ProLogix (East). Ex. 5 (Anderson Dep.) at 114:20-115:12, 393:16-396:25 (JA156, JA207-08).

Wal-Mart and Kroger agreed they would not to accept magazines from another wholesaler for at least fourteen days. *Id.* at 394:7-396:25 (JA207-08). In late 2008, Kroger pledged its support for Mr. Anderson's planned boycott,

███████████████████████████████████████

█████████████████████████████ Ex. 5 (Anderson Dep.) at 393:16-396:25 (JA1632, JA207-08). Executives from Wal-Mart gave similar assurances. Ex. 5 (Anderson Dep.) at 394:7-396:25 (JA207-08).

3.  Mr. Anderson also planned, if necessary, to "go dark", shutting down Anderson News' distribution nationwide and TNG's throughout the southeastern United States.

Before announcing his demands in January 2009, Mr. Anderson expected that publishers might once again resist Anderson News' demands, so Mr. Anderson developed a contingency plan he called "going dark". Under the "going dark" plan, beginning in February, Anderson News would cease distributing magazines nationwide, and Mr. Anderson would use his control of the ProLogix (East) joint venture to prevent TNG from delivering magazines to retailers throughout the southeastern United States—even to TNG's own retail customers. Ex. 5 (Anderson Dep.) at 415:23-417:23, 422:7-18 (JA212-14).

Mr. Anderson testified that his plan to shut down ProLogix (East) had been specifically intended to coerce publishers to accept a price increase by preventing TNG from competing against Anderson News throughout that region:

> Q. Okay. Did you understand when you made that decision that Prologix East would be unable to deliver The News Group's magazines in—in the areas that Prologix East serviced?
>
> A. I did.
>
> Q. Okay. Did you understand that the retailers in—in the area that Prologix East serviced would be without product?
>
> A. I did.
>
> Q. Is that what you intended?

21

A. I did.

. . .

Q. Okay. And that was all part and parcel of this strategy to bring the publishers to the table for a deal, whatever the deal was?

A. That's correct.

Ex. 5 (Anderson Dep.) at 442:20-443:8, 445:11-15 (JA219-20).

F. *Anderson News Announced the Seven-Cent Surcharge and the Shift of Inventory Costs.*

On January 12 and 13, 2009, Mr. Anderson and Mr. Stockard met with executives of several publishers to tell them that Anderson News would be demanding a seven-cent per copy surcharge and the shift of certain inventory costs. 56.1 ¶ 68 (CA1440-41). Mr. Anderson told the industry that the price increase was necessitated by Anderson News' disastrous financial situation. During his meeting with Ann Moore, CEO of Time, Mr. Anderson said that Anderson News needed the surcharge and inventory cost shift "to be viable" and that, if publishers did not agree to those terms, Anderson News might have to leave the business. 56.1 ¶ 69 (CA1441).

On January 14, 2009, Mr. Anderson held a conference call interview with John Harrington, publisher of the industry newsletter *The New Single Copy*. 56.1 ¶¶ 71-72 (CA1441). During the call, Mr. Anderson told the more than 300 industry participants that "over the last 10 years [our] profits have eroded to nothing and into significant losses." 56.1 ¶ 76 (CA1442). He announced that, if

22

any publisher did not sign a form agreeing to the terms of his demand, Anderson News would not distribute that publisher's magazines after February 1. 56.1 ¶ 79 (CA1443-44). Anderson News memorialized its demand in a letter dated January 14, 2009, and gave publishers until January 23, 2009, to sign and return the form agreement. Ex. 5 (Anderson Dep.) at 70:7-15, 499:5-15; Ex. 64 at AMIDSI00002191 (JA146, JA229, JA1450).

Earlier, when Mr. Anderson and Mr. Harrington privately planned the substance of the interview, Mr. Anderson admitted his plan even more directly. Mr. Harrington testified that Mr. Anderson told him that "if they didn't get an agreement, I don't recall if he initially told me anything about a sufficient level or what it was, but that they would cease operations, they would close the doors . . . . [I]f the financial situation was untenable, they couldn't continue to operate without this change". 56.1 ¶ 74 (CA1442).

G. *Co-Conspirator Source Joined in Announcing an Identical Seven-Cent Surcharge—But No Other Wholesaler Followed Suit.*

███████████████████████████

████████████████████████████

████████████████████████████

██████████████████████ On January 19, 2009, Source announced via letter an identical seven-cent per copy magazine distribution surcharge, also effective February 1, 2009. Margolskee Ex. 68 (JA1661).

23

On January 20, Mr. Anderson emailed Mr. Stockard to ask, "[a]ny announcements from the Source or News Group?"  Margolskee Ex. 69 (JA1663). Mr. Stockard replied, "NewsGroup management in New York today meeting with Publishers and making their plan announcement".  *Id*. (JA1663).  Later that day, Bo Castle, President of Anderson Services, confirmed that meeting in an email to Mr. Anderson:  "David Parry of TNG called this afternoon reporting that TNG was in New York today announcing their new distribution revenue producing program."  Margolskee Ex. 70 (JA1665).  Mr. Castle said TNG's plan "was different than Anderson but was after about the same cents per unit distributed" and that "Mike Korenberg [President of TNG's managing partner], Jimmy Pattison [owner of TNG's ultimate parent company] and Glen Clark [President of TNG's parent company] were all in New York working on this initiative".  *Id*. (JA1665).

Ultimately, TNG did not announce a similar price increase, nor did any other wholesaler besides Source.  Ex. 69 at HUDSON014871-72; Ex. 70 at CLARK000932-33 (JA753-54, JA1455-56).  Instead, TNG publicly stated on January 23 that it was not seeking a surcharge, and was prepared to replace Anderson News as the servicing wholesaler for most of Anderson News' retail accounts.  56.1 ¶ 93; Ex. 69 at HUDSON014872; Ex. 174 at TNG0005846 (CA1448-49, JA754, CA1274).

24



H.    *Publishers Responded to Anderson News' Demand in Various Ways, but Very Few Accepted the Terms Outright.*

Time, TWR, Hachette and other publishers and national distributors responded to Anderson News' supracompetitive demand in a variety of ways. Time, for example, sought to negotiate with Mr. Anderson throughout January.  On January 21, 2009, Richard Jacobsen, President of TWR, and two other TWR executives met with Mr. Anderson and Mr. Stockard to discuss Anderson News' demands.  56.1 ¶ 105 (CA1451).  Mr. Jacobsen conveyed Time's offer to reduce the price Anderson News paid for Time's weekly publications (People, Sports Illustrated, Time, Entertainment Weekly and any Sports Illustrated commemoratives) by two percentage points of the cover price and discussed the need to "reduce [TWR's] receivables exposure" to Anderson News, which Anderson News declined.  56.1 ¶ 106 (CA1452).  Throughout the month of

25

January, Mr. Jacobsen had several conversations with Mr. Anderson during which they discussed "the notion of a standstill so we can try and work something out, and the notion of [Mr. Anderson] simply backing off". 56.1 ¶ 107 (CA1452). On January 25, 2009, Mr. Jacobsen called Mr. Anderson and asked whether Anderson News would agree to maintain the pre-surcharge-demand status quo for a 30-day negotiating period; Mr. Anderson refused. 56.1 ¶ 108 (CA1452).

On January 27, Mr. Jacobsen sent Anderson News, on behalf of Time, a written "standstill" offer requesting a 30-day period during which Anderson News and TWR would "negotiate in good faith to reach a written wholesaler agreement, including resolution of issues surrounding scan-based trading". 56.1 ¶¶ 109-110 (CA1452-53). During that 30-day negotiating period, TWR offered to continue to ship magazines to Anderson News and to give Anderson News "an additional two percentage points of discount" on Time's weekly magazines. 56.1 ¶ 110 (CA1453). In return, TWR asked Anderson News not to impose a surcharge or SBT inventory cost shift during that 30-day period and asked Anderson News to pay its January 2009 bill on time. *Id*. (CA1453). The same day, Ann Moore, CEO of Time, spoke with Mr. Anderson's brother, Clyde Anderson, CEO of Books-A-Million, Inc., after calling him twice. 56.1 ¶ 111 (CA1453). She told him that Time had decided to stop shipping its magazines to Anderson News' competitor,

Source,[1] but that Time had offered a 30-day standstill negotiating period to Anderson News, and that she did not want Time's request for the standstill negotiating period to "fall through the cracks". 56.1 ¶ 111 (CA1453). Anderson News rejected the standstill offer the same day it was made. 56.1 ¶ 115 (CA1454).

The next day, Mr. Jacobsen informed Anderson News by letter that, given Anderson News' rejection of a standstill pending a negotiation of a long-term distribution agreement, Time would no longer sell magazines to Anderson News. Ex. 93 (JA1467). Time thereupon ceased shipments of its magazines to Anderson News. News 56.1 Additional Facts ¶ 25 (CA1470).

TWR and Time had been negotiating a wholesaler agreement with TNG (and with other wholesalers) during late January 2009. On January 28, 2009, TNG (through certain affiliates) signed an agreement with Time and TWR at the same improved prices that Time had offered to Anderson News, Source and TNG late in 2008 and again in January 2009. 56.1 ¶¶ 153-54 & n.2 (CA1462-63). That

---

[1] A number of additional factors influenced Time's decision to stop shipping magazines to Source. TWR's relationship with Source had deteriorated well before the surcharge announcement: Source sued TWR in May of 2008; TWR counterclaimed, alleging Source had defrauded TWR for more than $5 million; and after months of taking large, unauthorized discounts on its bills, Source paid only $4.9 million of the $28.9 million it owed for December 2008. Margolskee Ex. 66 at 4-8 (JA1644-48).

same day, Ingram entered into a wholesaler agreement with Time and TWR at the same improved prices. *Id*. (CA1462-63).

On January 29, 2009, Anderson News signed a 30-day extension of its existing agreement with alleged non-conspirator Comag. 56.1 ¶¶ 117, 122 (CA1454, CA1456 ). Unlike the standstill offer TWR made on January 27, the Comag extension did not afford Anderson News any increased discount or other price concessions. Accordingly, the terms Anderson News accepted from Comag were worse for Anderson News than the terms Mr. Jacobsen offered, and Mr. Anderson rejected, on January 27. 56.1 ¶¶ 109-111, 115, 117, 122 (CA1452-54, CA1456).

Hachette took a different approach. Hachette rejected Anderson News' demand on a long-term basis but agreed to pay the seven-cent surcharge for more than 780,000 copies of its magazines, to ensure that those magazines would be available to consumers for purchase. 56.1 ¶ 121; Ex. 97 at ANEWS0153184; Ex. 98 at CURTIS0034463-65; Ex. 99 (CA1455-56, JA1469, JA1472-74, JA1479-84). Mr. Stockard, Anderson News' president, testified that such a temporary agreement was acceptable to Anderson News at the time, Margolskee Ex. 28 (Stockard Dep.) at 442:3-11 (JA609), and, during the week of February 1, Hachette shipped magazines to Anderson News, Campbell Decl. ¶ 7; 56.1 ¶ 121 (JA1600, CA1455-56).

28

Ultimately, the vast majority of publishers—including hundreds of publishers not alleged to have been part of any conspiracy—refused to agree to the surcharge. Anderson News' internal Publisher Distribution Fee Response Log reflects that it received letters accepting the surcharge from only 87 of 1,571 publishers. Durand Ex. 36; 56.1 ¶ 425 (JA648-91, CA2833).

I. *Anderson News Obtained Renewed Commitments from Its Retailers To Boycott Any Publisher That Rejected the Price Increase.*

Rather than seek to do business with Time, TWR and Hachette on competitive terms, Mr. Anderson and Anderson News instead continued plans to organize a boycott by Wal-Mart and Kroger of publishers that refused its demand.

Anderson News executives asked Wal-Mart and Kroger to remove from the shelves of *all* their stores—not just the fraction of stores that Anderson News served—any magazines of publishers that did not accept Anderson News' demands. Margolskee Ex. 5 (Anderson Dep.) at 176:21-181:14 (JA167-69). Mr. Rustad of Kroger provided Kroger letterhead to Anderson News, on which Anderson News drafted a letter for Kroger to send to publishers, stating that Kroger would delist (i.e., refuse to carry) all magazine titles of any publisher that refused to pay the seven-cent surcharge for even one magazine it published. CC 56.1 ¶ 67 (CA2981). ███████████████████

█████████████████████████████

████████████████████████ The same night, Mr. Stockard asked

Mr. Anderson whether Wal-Mart also had committed to delist. Margolskee Ex. 75 at MBHN00124544 (JA1669). The next day, Mr. Stockard sent Wal-Mart a similar draft "delisting letter to Pub[lishers] and [national distributors]". Margolskee Ex. 92 at MBHN00124553 (JA1781).

Both before and after the February 1 deadline, Wal-Mart and Kroger repeatedly conveyed to Anderson News that they were "standing with the program", including the seven-cent surcharge, the inventory cost shift and the agreement not to distribute magazines after the February 1 cutoff date. Margolskee Ex. 5 (Anderson Dep.) at 179:13-181:10; Margolskee Ex. 75 at MBHN00124544 (JA168-69, JA1669). Mr. Anderson testified that Wal-Mart and Kroger never indicated that they were "no longer on board" until February 10, the day after Mr. Anderson states Anderson News went "out of business". Ex. 5 (Anderson Dep.) at 181:15-23, 183:3-25, 184:7-19 (JA169).

J.     *The Pre-Planned "Going Dark" Plan is Executed.*

On or about February 2, facing competition from TNG and resistance from publishers, Mr. Anderson executed his "going dark" plan. Mr. Anderson shut down Anderson News and Anderson Services and refused to deliver magazines that Anderson Services already had in its warehouses. Ex. 5 (Anderson Dep.) at 415:23-416:5, 422:20-24, 428:19-429:13, 444:18-445:15, 475:20-25, 608:2-5; Margolskee Ex. 47 (Castle Dep.) at 80:3-11 (JA212-14, JA216, JA220, JA224,

JA244, JA1129).  Anderson News did not deliver Hachette's magazines, even

though Hachette had agreed to pay the seven-cent surcharge for February █████

███████████████████████████████████████████████████████████████████

███████████████████████████ 56.1 ¶¶ 117, 121-22; Ex. 97 at

ANEWS0153184; Ex. 98 at CURTIS0034463-65; Campbell Decl. ¶ 7; Durand

Exs. 37-42, 44 (CA1454-56, JA1469, JA1472-74, JA1600, CA281-294, CA301-

02).  Hachette and AMI were forced to sue Anderson News to retrieve their locked

up magazines.  Margolskee Ex. 82 (JA1682-98)

By early February, TNG had made arrangements to take over

distribution to numerous retail locations that Anderson News had previously

served. ████████████████████████████████████ Anderson

Decl. ¶ 10 (CA1485, CA1487, JA2326-27); Br. 22-23.  Mr. Anderson's answer

was not to match TNG's prices but instead to use his control of the ProLogix (East)

joint venture to shut down TNG's business throughout the southeastern United

States.  Ex. 5 (Anderson Dep.) at 415:23-416:5, 422:20-24, 428:19-429:13,

444:18-445:15, 608:2-5; Margolskee Ex. 47 (Castle Dep.) at 80:3-11 (JA212-14,

JA216, JA220, JA244, JA1129).  Thus, on February 7, 2009, at Mr. Anderson's

direction, an Anderson Services executive announced that ProLogix (East) would

stop deliveries immediately and that its associates would not report to work the

following Monday.  56.1 ¶¶ 125-26 (CA1457).  Mr. Anderson knew that TNG had

a supply of magazines locked in ProLogix (East)'s warehouses that TNG could not access or deliver and that ProLogix (East) employees had had their cell phones, laptops, and warehouse and vehicle keys taken away. 56.1 ¶ 127 (CA1457). By shutting down ProLogix (East), Mr. Anderson de facto secured TNG's unwilling participation in the conspiracy. Ex. 5 (Anderson Dep.) at 415:23-417:23, 422:7-18; ███████████████████ at 216:7-217:3, 288:13-22 (JA212-14, CA192-94).

On February 8, 2009, a TNG corporate affiliate filed suit for a temporary restraining order in the District of Delaware to require ProLogix (East) to continue distributing TNG's magazines to retailers. 56.1 ¶ 133 (CA1458-59). On February 9, the district court informed the parties that it would grant that TRO, which it issued on February 10. 56.1 ¶ 134 (CA1459).

K. *Mr. Anderson Opted To Shut Down Anderson News Rather Than Continue To Compete in a Business That Had Been Unprofitable for Years.*

In Mr. Anderson's own words, the ProLogix (East) court order "opened the floodgates up" and Anderson News "became quickly insolvent". 56.1 ¶ 135 (CA1459). Mr. Anderson testified that TNG's ability to reopen the ProLogix (East) joint venture (and thereby compete against Anderson News) was Anderson News' "Achilles Heel", which meant "game over". 56.1 ¶ 135-136 (CA1459). Although Anderson Services had not liquidated any of its hard assets, and no

32

Anderson News or Anderson Services employee had been terminated on a permanent basis, Mr. Anderson irrevocably decided to close Anderson News and Anderson Services once he learned that a TRO from the Delaware district court was imminent. Ex. 5 (Anderson Dep.) at 576:18-577:9, 578:6-24 (JA240). On February 9 and 10, 2009, Mr. Anderson began the process of liquidating the companies. 56.1 ¶ 138-140 (CA1459-60).

Even after finding out on February 12, 2009, that Source had secured a TRO requiring publishers to continue selling their magazines to Source at preexisting prices, Anderson News did not ask publishers to continue supplying it with magazines in light of the Source TRO or seek its own TRO. Margolskee Ex. 5 (Anderson Dep.) at 573:14-574:18 (JA239). Instead, as Mr. Anderson testified, because TNG had won a court order requiring ProLogix (East) to reopen, "[i]t was too late for me". 56.1 ¶ 143 (CA1460-61).

When Mr. Anderson shuttered Anderson News, it owed Defendants more than $100 million. Ex. 118 at 18-30 (JA1515-27). That debt was unsecured, and it stood behind an unusual secured bank loan: a $115 million market-rate revolving loan held by a consortium of three banks, with an outstanding balance of $85.2 million (as of December 26, 2008), guaranteed by the full amount in cash or cash equivalents deposited with those banks by Anderson News' ultimate parent,

33

Anderson Media. 56.1 ¶ 304; Keyko Ex. 3 at MBHN00008106, '120, '140; Davis

Ex. 320 at ANEWS0163291 (CA1303, JA954, JA968-69, JA2173-84).

L.     *TWR Signed Contracts with Anderson News' Competitors on Terms More Favorable to Time and TWR Than What Time and TWR Had Offered Anderson News in the Standstill Proposal.*

In January 2009, each wholesaler of Time magazines, including

Anderson News, Source, TNG, Ingram Periodicals Inc. and Hudson, was able to

purchase Time magazines at the same prices. 56.1 ¶ 152 (CA1462). Beginning in

January 2009, TWR signed an Enhanced Services Agreement ("ESA") with each

wholesaler of Time magazines other than Anderson News, which provided the

wholesalers with a 2.75 percentage point discount on People magazine in addition

to the discount that was in effect in January 2009, in exchange for improved

payment and service terms, and did not provide for the transfer of any inventory

costs. 56.1 ¶¶ 153-54 (CA1462-63). The additional 2.75 percentage points of

discount on People magazine was economically equivalent to the additional

two percentage points of discount on all of Time's weekly titles that Time had

previously offered to Anderson News and other wholesalers in late 2008 and early

2009, and to Anderson News in its standstill offer of January 27. 56.1 ¶ 154

(CA1463).

As part of the ESAs, wholesalers agreed to a limit on their receivables

balance with TWR, to abide by the terms of TWR's Policy Manual and that TWR

34

would determine store-level allotments. Ex. 168 (JA1528-33). Those terms were more favorable to Time and TWR than any terms Anderson News ever offered to Time and TWR after it made its surcharge and SBT inventory cost shift demands in January 2009, and more favorable to Time and TWR than the standstill offer Time had extended to Anderson News on January 27, 2009 (which provided the same magazine pricing but which had not required a reduction of Anderson News' receivables balance and had not required Anderson News to abide by the terms of TWR's Policy Manual).

Likewise, Hachette continued to do business with other wholesalers on terms in place before Anderson News' announcement that were more favorable to Hachette than the increased prices Anderson News was demanding. Ex. 95 (Masterson Dep.) at 57:9-58:10, 86:22-87:7 (CA1030, CA1032).

M. *Counter-Claimants-Cross-Appellants Suffered Substantial Losses as a Direct Result of the Group Boycott and Collusive Price Increase.*

As a direct and intended result of Mr. Anderson and Anderson News' anticompetitive scheme, Time, Hachette and AMI lost millions of dollars of magazine sales. Margolskee Ex. 77 (Kent Dep.) at 20:19-23; Margolskee Ex. 78; Margolskee Ex. 79 (Masterson Dep.) at 28:19-25, 38:22-39:2; Margolskee Ex. 81 (CA1521, JA1673-80, CA1535, CA1538, CA1552-1670). In furtherance of their conspiracy, Anderson News and Source collusively set the same unreasonable deadline—February 1—to prevent publishers from making orderly alternative

35

arrangements to get their magazines to consumers.  Margolskee Ex. 1 at
ANEWS0151821; Margolskee Ex. 60 at 1; Margolskee Ex. 68 (JA919, CA1499,
JA1661).  Publishers also lost sales because Anderson News obtained
commitments from retail clients to boycott uncooperative publishers and because,
pursuant to his anticompetitive "going dark" plan, Mr. Anderson cut off delivery of
magazines to Anderson News' and TNG's retail customers, making it impossible
for many consumers to purchase magazines they desired.

Time and AMI lost further profits because Anderson News withheld
millions of dollars of payments due to them near the end of January 2009 as part of
its scheme to force their capitulation to the conspiracy.  As Mr. Maier, a senior
Anderson Media executive, planned:  "Best time to announce to publishers in order
to weather the storm would be 2-3 weeks prior to publisher payment date to give
enough time to see publisher action and then *to react by sending no payment on the
due date*."  Margolskee Ex. 85 at ANEWS0153686 (emphasis added) (JA1704).
Withholding payments advanced the conspiracy's objectives, because "[w]ithout
Anderson remittance national distributors['] cash flows are adversely affected.
They are unable to advance print costs to weakest titles and titles fail."
Margolskee Ex. 85 at ANEWS0153684 (JA1702). ███████████████████

████████████████████████████████████████

████████████████████████████████████

████████ Margolskee Ex. 86 at 1 (CA1680). On Friday, January 30, 2009,

Anderson News failed to make a payment due to TWR of $11.3 million, which

caused injury to Time, because Time funded TWR's costs in 2009. Margolskee

Ex. 77 (Kent Dep.) at 175:4-6, 264:20-266:23; Margolskee Ex. 93 (Jacobsen Dep.)

at 27:18-28:25 (CA1526, CA1528-29, JA438).

Time also incurred significant costs because the conspiracy forced it

to make emergency alternative distribution arrangements to replace Anderson

News and Source. Although Source eventually rescinded its surcharge, it did not

do so for Time until February 5. Margolskee Ex. 90 at SOURCE_00001309;

Margolskee Ex. 91 (CA1686-88, JA1775-79). By that point, Time had already

made commitments to Hudson in return for Hudson's expansion to areas that

Hudson had not previously served, and Hudson threatened litigation against Time

and TWR unless they compensated it for its already incurred distribution

expenditures. Margolskee Ex. 138 at TIMEAND00001734-35 (JA1921). In

December 2009, Hudson settled that claim for ████████. *Id*. (JA1923).

████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████

N.    *Procedural History.*

On March 10, 2009, Anderson News and Anderson Services filed suit pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, in the United States District Court for the Southern District of New York (Crotty, J.), alleging that defendant publishers, national distributors and wholesalers had conspired to drive Anderson News and Anderson Services out of business in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Ex. 1 ¶¶ 97-101 (JA97-98). They also brought state-law claims for tortious interference with business relationships and civil conspiracy.  Ex. 1 ¶¶ 102-115 (JA98-100).  The claims against wholesaler defendants Hudson and TNG were dismissed by stipulation. S.D.N.Y. ECF Nos. 3, 250.

Initially, the district court dismissed the complaint, which this Court reversed on appeal.  *Anderson News, L.L.C. v. Am. Media, Inc.*, 732 F. Supp. 2d 389, 405 (S.D.N.Y. 2010), *rev'd*, 680 F.3d 162, 194 (2d Cir. 2012).  This Court held that the Proposed Amended Complaint stated a claim for relief, but "express[ed] no view as to the merits of Anderson's claims or as to whether motions for summary judgment will become appropriate".  *Id.* at 194.

On August 20, 2015, the district court granted summary judgment against Plaintiffs-Appellants' claims in their entirety, finding that the "differing reactions" of Defendants-Appellees to Anderson News' demand "do not support an

38

inference of 'parallel business conduct'" (SA25) that would "tend[] to exclude the possibility that [Defendants-Appellees] acted independently" (SA41). The district court observed that Anderson News and Anderson Services demonstrated no cognizable injury and cited no precedent for their use of the antitrust laws to force other parties to acquiesce to economically unreasonable, supracompetitive pricing terms. (SA31-34, 42.)

The district court also found no genuine issue of material fact concerning causation and that "Anderson News' collapse was entirely due to its own actions, and nobody else's" (SA43): Anderson News had imposed an increased price and inventory cost-shift demand, made clear that it would not distribute magazines after February 1 for any publisher that resisted, executed a pre-planned "going dark" strategy when its demand was not met and then voluntarily elected to shut down rather than accept terms its competitors had accepted. (SA43-45.)

The district court granted summary judgment dismissing Plaintiffs-Appellants' state-law claims in their entirety. (SA45-46.)

Finally, the district court granted summary judgment dismissing the counterclaims on the ground—not advanced by Anderson News or Mr. Anderson—that, even absent a conspiracy, counterclaimants Time, Hearst and AMI would still have refused Anderson News' and Source's demands, Anderson

39

News would still have gone out of business and been unable to repay its debts and Time, Hearst and AMI would still have incurred the costs of making arrangements to replace Anderson News and Source as its wholesalers. (SA46-49.)

## SUMMARY OF THE ARGUMENT

I.A.  The undisputed factual record demonstrates that Anderson News refused to do business with Time, TWR and Hachette on terms available from Anderson News' competitors and that Time, TWR and Hachette never refused to deal with Anderson News on the same terms offered by Anderson News' competitors. Each of those facts is independently fatal to any group boycott or concerted refusal claim.

I.B.  The undisputed facts demonstrate that Anderson News' own "ill-conceived and badly executed plan" caused the downfall of Anderson News and Anderson Services. (SA3.)  Anderson News and Anderson Services had years of severe financial losses predating 2009.  Mr. Anderson announced he was unwilling to continue in the wholesaling business at the prices prevailing in the market in December 2008, and he rejected prices and terms that his competitors accepted in January and February 2009.  Instead, Mr. Anderson organized a boycott involving his competitors and the largest magazine retailers, culminating in a "going dark" plan to deprive consumers of magazines.  When the Delaware federal court prevented Mr. Anderson's "going dark" plan from continuing, the undisputed

40

record demonstrates that Mr. Anderson decided to close Anderson News and Anderson Services rather than continue to compete at prevailing market prices and terms.

II.  Anderson Services' Clayton Act claim independently fails because it lacks antitrust standing.  Anderson News and Anderson Services were separate legal entities.  Anderson *News* was the entity that negotiated prices with publishers, paid and received payment from publishers, and made the commitment to wholesale publishers' magazines.  Anderson News, in turn, contracted with separate legal entities (ProLogix (East), ProLogix (West) and Anderson Services) to handle the physical delivery, merchandising and returns processing of magazines to retailers.  Anderson Services lacks antitrust standing because any injury it may have suffered was entirely derivative of the injury to Anderson News, and arose from Anderson Services' role as a mere supplier to Anderson News (or, even more remotely, as co-owner of a joint venture that was a supplier to Anderson News).

III.  Anderson News' and Anderson Services' state-law claims fail for the same reasons as their antitrust claims.  They do not argue that their state-law claims should be reinstated for any reason independent of their antitrust claims, and have forfeited any such argument.

41

IV.  Time, Hearst (as successor-in-interest to Hachette) and AMI asserted counterclaims against Mr. Anderson and Anderson News for the injuries suffered as a result of Mr. Anderson's conspiracy.  Anderson News and Mr. Anderson have not challenged the sufficiency of evidence establishing that they organized a horizontal and vertical group boycott to coerce publishers into accepting a price increase.  Instead, the district court dismissed the counterclaims on the rationale, never raised or briefed by any party, that publishers would have suffered the same injuries absent the conspiracy.  However, Mr. Anderson, Anderson News and their co-conspirators targeted publishers and took calculated steps to inflict the maximum amount of damage on them in an effort to coerce them into acquiescing to supracompetitive prices.  At a minimum, there is a triable factual issue as to whether the damages sought in respect of the counterclaim would not have occurred absent a conspiracy, even if Anderson News and Anderson Services had ceased operations.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment.  *Byrne v. Rutledge*, 623 F.3d 46, 52 (2d Cir. 2010).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law".  Fed. R. Civ. P. 56(a).  "The mere existence of some alleged fact dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact". *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). "[S]ummary judgment is an important procedural device in antitrust cases, because it enables courts to efficiently resolve potentially costly and time-consuming litigation which can chill competitive forces". *Clorox Co. v. Sterline Winthrop, Inc.*, 117 F.3d 50, 55 (2d Cir. 1997).

## ARGUMENT

## I. THE UNDISPUTED EVIDENCE OF RECORD ENTITLED DEFENDANTS TO JUDGMENT.

As the district court held:

"Anderson's claim of injury from a concerted refusal to deal, which forced it out of the business, must be rejected. It is clear its own ill-conceived and badly executed plan led to its downfall. The antitrust laws do not compel any entity to accept a price increase, or assume the burden of a significant cost. This is especially so where there were other wholesalers available who offered lower prices and less expensive terms for handling inventory."

(SA3-4.)

The undisputed evidence demonstrates that none of Time, TWR or Hachette refused to deal with Anderson News. To the contrary, the undisputed evidence before the district court demonstrated that each of Time, TWR and Hachette sought to reach an agreement with Anderson News, but insisted that it be on competitive terms. It was Anderson News who refused to meet the price and terms available from its competitors. The undisputed evidence before the district

43

court also established that it was Anderson News and Mr. Anderson who drove the events that led to Anderson News' closure, not any group boycott or refusal to deal by publishers and distributors. Anderson News admitted that it had been losing substantial sums of money and that it required the price increase and shift of costs it demanded in January 2009. Without that price increase and change in terms, Anderson News was not willing to remain in the business. Having failed in previous attempts unilaterally to force publishers and distributors to accept price increases, Anderson News conceived of, and implemented, a plan designed to force such an increase.

As set forth in the statement of facts, the undisputed evidence before the district court established that Anderson News and Mr. Anderson's plan included the organization of a boycott against publishers and distributors who resisted Anderson News' price increase; threats to refuse to deal with non-compliant publishers and distributors; and ultimately the shut down of substantial portions of one of its competitors' operations to forestall competition from that competitor, TNG, who had reached agreements with publishers and distributors that Anderson News would not match. As the district court held, once Anderson News was enjoined by a federal court, "it chose to go out of business". (SA2). Faced with Anderson News' effort to force supracompetitive prices and changes in terms, Time, TWR, and Hachette acted as any responsible business entity would:

44

they reached or had agreements with other competitors of Anderson News on

market terms and rejected Anderson News' above-market demands.

We turn first to Anderson News' failure to come forward with any

evidence that Time, TWR or Hachette engaged in any group boycott or refusal to

deal.

A.   *The Undisputed Evidence Before the District Court Establishes that Time, TWR and Hachette Did Not Engage in Any Group Boycott or Concerted Refusal to Deal.*

The record before the district court established that (1) Anderson

News did not offer competitive terms to Time, TWR or Hachette and (2) Time,

TWR and Hachette did not refuse to deal with Anderson News on competitive

terms.

1.   Anderson News Never Attempted To Do Business with Time, TWR or Hachette On Competitive Terms.

To prove a group boycott or concerted refusal to deal claim, a plaintiff

must show that it attempted to do business with the defendant on the same terms as

the plaintiff's competitors.  *See Webster Rosewood Corp. v. Schine Chain

Theatres*, 263 F.2d 533, 536 (2d Cir. 1959).  Where the plaintiff's alleged injury

stems from its demand for an above-market price, the plaintiff is not entitled to

relief under the antitrust laws.  *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391

U.S. 253, 279 (1968) (discussing the type of evidence that could sustain a group

boycott claim and explaining "[o]bviously it would not have been evidence of

45

conspiracy if Cities refused to deal with [plaintiff] because the price at which [plaintiff] proposed to sell oil was in excess of that at which oil could be obtained from others"); *see also Am. Tel. & Tel. Co. v. Delta Commc'ns Corp.*, 590 F.2d 100, 102 (5th Cir. 1979) (affirming grant of summary judgment on Sherman Act claim where plaintiff's offer to do business was "demonstrably unattractive" to the competitive marketplace). A plaintiff "is only entitled to be placed in the same competitive situation as its competitors". *Royster Drive-In Theatres v. Am. Broad.-Paramount Theatres*, 268 F.2d 246, 250 (2d Cir. 1959). In the district court, Anderson News asserted that the law is otherwise, but it never cited contrary authority, never disputed that *Royster*, *Webster* and *Cities Services* are binding caselaw, and never articulated what legal standard it believed did apply. S.D.N.Y. ECF No. 386 at 20-23 (JA1592-95). It has forfeited any argument to the contrary.

Anderson News never made an offer to Time, TWR or Hachette at prices its competitors accepted. Anderson News demanded a surcharge of seven-cents for each copy it distributed and also required publishers to bear more than $70 million in inventory costs. 56.1 ¶ 77 (CA1442-43). No other wholesaler charged a price that high for its wholesaling services. 56.1 ¶¶ 92-94, 152-154 (CA1448-49, 1462-63). TNG, Hudson, Ingram and 40 smaller wholesalers continued to distribute magazines on their pre-existing terms, without Anderson News' seven-cent surcharge or SBT cost shift. 56.1 ¶¶ 92-94 (CA1448-49).

46

Beginning in late January, those wholesalers entered into multi-year agreements with Time and TWR, agreeing to the price reduction for Time's magazines that Time had previously offered, in exchange for limits on their outstanding indebtedness and agreement to TWR's Policy Manual. 56.1 ¶ 153-54 (CA1462-63). Even Source, which also announced a seven-cent surcharge, never demanded a price as high as Anderson News because it did not ask for a shift of SBT inventory costs, 56.1 ¶ 89-90 (CA1447), and signed a multi-year agreement with Time and TWR on the same terms as TNG, Ingram and all other wholesalers, Ex. 129 (CA1196-1271).

Anderson News also behaved differently from its competitors in other important ways. No other wholesaler refused to distribute magazines of publishers if its terms were not met, and no other wholesaler threatened to cease operations. 56.1 ¶¶ 79, 81, 83, 119 (CA1443-45, CA1455). Anderson News cannot recover from Time, TWR and Hachette just because it did not get the terms it sought "free from the necessity of competing" for such terms, when Anderson News' competitors offered and accepted terms unacceptable to Anderson News. *See Dahl, Inc. v. Roy Cooper Co.*, 448 F.2d 17, 19 (9th Cir. 1971). That is not an "injury" for which the antitrust laws provide a remedy, and indeed would be inimical to the very purpose of those laws. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the Act is not to protect

47

businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

Anderson News' extension with Comag highlights Anderson News' failure to make a competitive offer to Time, TWR or Hachette. On January 25, Mr. Jacobsen called Mr. Anderson and asked if Anderson News would maintain the status quo for a 30-day negotiating period. 56.1 ¶ 108 (CA1452). Mr. Anderson rejected that offer. *Id*. (CA1452). On January 27, Mr. Jacobsen reiterated his request for a 30-day negotiating period and offered Anderson News an additional discount of two percentage points off the cover price of Time's weekly magazines. 56.1 ¶ 109-10 (CA1452-53). Mr. Anderson also rejected that offer. 56.1 ¶ 115 (CA1454). Yet, a mere two days after Mr. Anderson rejected TWR's offers for a 30-day negotiating period at improved prices, Mr. Anderson reached an agreement for a 30-day negotiating period with Comag with no price improvement. (Br. 16.) Mr. Anderson claims he agreed to a 30-day extension with Comag, but not Time, because he believed he could get a better deal in the future with Comag, but needed to keep the maximum pressure on Time. Anderson Decl. ¶ 3; Davis Ex. 213 (Anderson Dep.) 306:7-20 (JA2324-25, JA192); Br. 16. Anderson News could have obtained Time's magazines on the terms its

48

competitors accepted, but it chose not to.  Its reasons for refusing, whether good or bad business judgment, cannot transform Time's genuine offer into a group boycott.

Anderson News never made any offer to Hachette, other than its seven-cent surcharge and inventory shift ultimatum.  Ex. 27 (Stockard Dep.) 443:2-444:12; Ex. 5 (Anderson Dep.) 209:5-17; Durand Ex. 18 (Stockard Dep.) 388:5-9 (JA609, JA176, JA607). Indeed, although Hachette rejected Anderson News' demand on a long-term basis, it decided to pay the surcharge for over 780,000 magazines it shipped to Anderson News for distribution in February, so those magazines would be available to consumers.  Exs. 97, 98, 99 (JA1469-84). Although Anderson News now argues that Hachette's agreement was only temporary and Hachette shipped fewer magazines than it had shipped to Anderson News in prior months, 56.1 ¶ 121 (CA1455-56), those arguments are makeweight. Anderson News had publicly advertised that publishers did not need to agree to its surcharge for any particular length of time, and Mr. Stockard, Anderson News' President, reaffirmed that publishers could pay now and decide not to pay in the future.  Margolskee Ex. 28 (Stockard Dep.) at 442:4-11; Cyrulnik Ex. 29; Ex. 27 (Stockard Dep.) at 352:21-22 (JA609, JA1956-61, JA602).  As to the reduced number of copies, the raison d'être for the per copy surcharge, as Anderson News repeatedly explained, was to give an incentive to publishers to reduce sharply the

49

number of copies shipped to Anderson News. Ex. 52 at ANEWS0151831; Cyrulnik Ex. 29 (JA929, JA1956-61). Anderson News can hardly argue that Hachette participated in a conspiracy by doing exactly what Anderson News asked. *See Reading Int'l, Inc. v. Oaktree Capital Management, LLC,* 2007 WL 39301, at * 9 (S.D.N.Y. 2007) (granting summary judgment given evidence "[defendant] was licensing movies to [a plaintiff], the very thing that [p]laintiffs allege the distributors conspired . . . not to do").

The undisputed facts establish that both before February 2 and after, Anderson News refused to offer Time, TWR or Hachette prices competitive with those offered by Anderson News' wholesaler competitors. A demand "on an equality" with competitors is a "necessary condition of any claim for relief". *Webster*, 263 F.2d at 536. Anderson News' failure to meet that "necessary condition" entitles Time, TWR and Hearst to affirmance of the district court's grant of summary judgment.

> 2. Anderson News Cannot Prove that Defendants Refused To Deal With It on Competitive Terms.

Summary judgment was properly granted on Anderson News' group boycott claim for the independent reason that Anderson News cannot prove Time, TWR or Hachette refused to deal with it on competitive terms.

To prove a concerted refusal to deal, an antitrust plaintiff must show that the defendants refused to deal with it on terms equal to the terms the

defendants offered to the plaintiff's competitors.  *Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1086, 1089-90 (N.D. Cal. 2002) ("[T]he seller must deal on substantially equal terms.  If the seller refuses to deal on substantially equal terms, then the conduct can be predatory.  But there must actually be conduct amounting to a *refusal* to deal on substantially equal terms."), *aff'd*, 94 F. App'x 529 (9th Cir. 2004).  A defendant's refusal to pay more than the competitive market rate is not actionable under the antitrust laws.  *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1206 (7th Cir. 1981) ("The gravamen of [plaintiff's] complaint does not appear to be defendants' refusal to deal but rather defendants' refusal to pay more than the prevailing competitive price . . . . [T]he antitrust laws were not intended to provide redress of losses resulting from noncompetitive prices.").  A defendant does not violate the antitrust laws if it refuses to accept a proposal based on "valid business reasons", such as "the availability of other, more cost-effective" alternatives.  *AD/SAT v. Associated Press*, 181 F.3d 216, 240 (2d Cir. 1999).

These prerequisites are animated by basic antitrust principles.  "[L]ow prices are a positive aspect of a competitive marketplace and are encouraged by the antitrust laws."  *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 269 (2d Cir. 2001).  A plaintiff wholesaler whose complaint is that its customers decline its services in favor of lower-cost wholesalers "is really claiming that it [is] unable to raise prices" in light of market competition, which "is not *antitrust*

injury", *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 337-38 (1990); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("It is inimical to the purposes of [the antitrust] laws to award damages [where the claimed injury is the deprivation of the profits of decreased competition.]").

        The undisputed evidence shows that Time, TWR and Hachette never refused to deal with Anderson News on competitive terms. By January 28, 2009, Time and TWR had signed multi-year agreements with TNG and Ingram, and shortly thereafter signed near-identical agreements with dozens of other wholesalers, including Source. 56.1 ¶ 153 (CA1462). Anderson News does not and cannot contend that Time or TWR ever refused to deal with it on those terms. 56.1 ¶¶ 92-93, 152-154 (CA1448-49, CA1462-63). It is also undisputed that the terms TWR offered on January 27 were better for Anderson News than the terms Anderson News' competitors agreed to accept. 56.1 ¶ 110, 153-154 (CA1453, CA1462-63). Anderson News produced no evidence whatsoever that Time or TWR ever refused to sell it magazines on terms they offered or provided to other wholesalers. Indeed, Mr. Anderson, in his January 14 telephone interview, announced that Time had offered Anderson News two points of additional discount, and that Anderson News had rejected that offer— the same discount every single one of its competitors accepted shortly thereafter. 56.1 ¶¶ 56, 153-54 (CA1436, CA1462-63).

52

Anderson News can point to no evidence whatsoever that Hachette refused to deal with it on competitive terms. Indeed, Hachette agreed to pay the surcharge for the month of February. 56.1 ¶ 121; Exs. 97, 98 (CA1455-56, JA1469-77). Anderson News concedes that it received copies of Hachette's magazines after February 1. Campbell Decl. ¶ 7 (JA1600). Anderson News, however, did not distribute the magazines Hachette had shipped and for which it had agreed to pay the surcharge, and Hachette had to sue Anderson News in order to retrieve them. CC 56.1 ¶ 102; ████████████████████████ ████████████████████████████ Margolskee Ex. 82 (CA2988, CA1036-38, CA1040, JA1682-98).

In its brief, Anderson News ignores the efforts Time, TWR and Hachette (through its national distributor Curtis) made to negotiate with it and instead asserts that they could not have chosen to reject Mr. Anderson's surcharge without collusion, relying solely on the opinion of an expert with no prior experience in the magazine distribution business. (*See* Br. 43, 49.) This Court, however, has held that when a defendant attempts to negotiate with a plaintiff, courts will not infer an unlawful refusal to deal. *See AD/SAT*, 181 F.3d at 237 ("[T]he facts belie [plaintiff's] claim that [a defendant] refused to deal with it; up to the time this action was commenced, [the defendant] was attempting to negotiate a new affiliation agreement with [plaintiff].").

53

The undisputed record evidence belies Anderson News' argument. If publishers could not unilaterally turn to other wholesalers, Anderson News would not have failed in its many prior attempts to impose price increases. If publishers could not have unilaterally replaced Anderson News with other wholesalers, Mr. Anderson would have had no need to solicit his competitors to increase prices simultaneously, would have had no need to obtain Wal-Mart's and Kroger's agreement to refuse to sell magazines of publishers that did not yield, and would have had no reason for his "going dark" plan. If publishers could not unilaterally have switched to other wholesalers, Anderson News and Anderson Services would not have lost money for a decade.

Over sixty years ago, this Court examined a similar dislocation in this very industry, and held that a magazine publisher does not violate the antitrust laws when, dissatisfied with its preexisting wholesaler, it switches to a new wholesaler *and encourages competing publishers to do the same in order to make the new wholesaler viable*. *Interborough News Co. v. Curtis Publ'g Co.*, 225 F.2d 289, 293-94 (2d Cir. 1955).

In *Interborough*, the plaintiff, a magazine wholesaler, alleged that defendant publishers and national distributors had conspired to force the plaintiff out of business. *Id*. at 290-91. This Court concluded that, although the evidence "show[ed] quite plainly that Curtis [one of the national distributors] made

54

persistent and almost continuous efforts to induce other national distributors to leave Interborough and come over to the thirteen new competing wholesalers", that conduct did not violate the antitrust laws. *Id*. at 292. This Court recognized that Curtis had a right to "use every reasonable effort to influence and persuade other national distributors to patronize the new competing wholesalers" in order to permit them to viably compete. *Id*. at 293.

Here, Anderson News argues that "collusion was essential" because "a single defendant acting unilaterally could not have convinced retailers to allow it to use a different wholesaler". (Br. 43.) Even were that true, that conduct would be protected under *Interborough*. In the face of Anderson News' supracompetitive demands, any publisher or national distributor had a "legal right to break away" from Anderson News and to "use every reasonable effort to influence and persuade other national distributors to patronize" wholesalers that competed with Anderson News. *See Interborough*, 225 F.2d at 293. The antitrust laws protect competition, not competitors. Competition is precisely what happened here, and even if Time, TWR or Hachette had chosen "to induce as many of the other national distributors [and publishers] as they could to make a similar change" (which they did not), those decisions would not be actionable under the antitrust laws. *See id*. Indeed, "[n]o court has ever held . . . that the antitrust laws require businesses to accept a higher price than that which is offered by competitors." (SA31 n.16.)

55

In sum, Time, TWR and Hachette (through Curtis) all dealt with Anderson News, making efforts to reach agreements on prices and terms. Those efforts failed because Anderson News refused to accept anything less than supracompetitive terms and prices. While Anderson News, Mr. Anderson and their co-conspirators were implementing their scheme to force a price increase, Time, TWR and Hachette reached or had preexisting lower-cost agreements with Anderson News' competitors. Having refused to compete for the business of Time, TWR and Hachette, Anderson News cannot complain that they took their business elsewhere. Indeed, that is precisely how a competitive market should work. Both the governing law and the undisputed facts support the district court's determination that "Anderson's claim of injury from a concerted refusal to deal, which forced it out of the business, must be rejected". (SA3)

B. *The Shut Down of Anderson News and Anderson Services Was the Result of the "Ill-Conceived and Badly Executed Plan" to Force Supracompetitive Terms and Prices Onto Suppliers.*

"[L]ack of causation in fact is fatal to the merits of any antitrust claim." *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41 (2d Cir. 1986). A plaintiff must meet two requirements to establish causation-in-fact. *First*, a plaintiff must prove, with a "fair degree of certainty", *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994), that the defendant's alleged antitrust violation "was a substantial or materially contributing factor" in

56

producing the alleged injury, *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 823 n.49 (2d Cir. 1983). *Second*, a plaintiff also must prove that "the injuries alleged would not have occurred but for [the defendant's alleged] antitrust violation". *Argus*, 801 F.2d at 41. This second requirement "add[s] necessity to the materiality requirement of [the] antitrust causation analysis". *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012).

The district court correctly held that that "Anderson News' collapse was entirely due to its own actions, and nobody else's". (SA41-42.) After extensive discovery, the undisputed evidence demonstrated that Anderson News put into motion the events leading to its exit from the business as part of a strategy to force its suppliers to accept terms and prices from Anderson News that were worse than terms and prices available from its competitors. In furtherance of that scheme, Anderson News, by Mr. Anderson's own admissions, organized a boycott to force publishers to accept the supracompetitive terms and pricing Anderson News needed to survive. That boycott included Anderson News' threat to halt deliveries of magazines and the participation of the two largest retailers. Anderson News also sought to enlist ███████████ competitors as participants in its scheme. One, Source, joined and demanded the same seven-cent per copy price increase;

███████████████████████████████████████████

███████████████████████████████████████████

Anderson News in fact had numerous opportunities to reach agreement with Time, TWR and Hachette (through Curtis) on competitive terms. Anderson News rejected those offers to deal at market rates and instantly responded by closing down TNG's operations in the southeastern United States until a federal court intervened to bring an end to Mr. Anderson's "going dark" plan. When that happened, Anderson News closed its business instead of attempting to compete with TNG and Source on market terms and prices. On that record, Anderson News cannot establish causation-in-fact.

That Mr. Anderson's decisions were the cause of Anderson News and Anderson Services' exit is also apparent from the undisputed fact that Source— which Anderson News alleges was a victim of the same group boycott—remained in business. 56.1 ¶¶ 95-96, 104 (CA1449, CA1451). After Source realized that publishers were not agreeing to its surcharge, and TNG had announced that it would not seek one, Source began retracting its demand as to some publishers. 56.1 ¶¶ 97-99 (CA1449-50). It also sent a letter to publishers to reassure them that it would continue to "distribute and service all copies received at its distribution centers after February 1, 2009". 56.1 ¶ 100 (CA1450). Whereas Anderson News withheld payments to national distributors (including Comag) at the end of January, Source paid $25 million to TWR in early February. CC 56.1 ¶¶ 83-91; Moskowitz Ex. 87 (Mays Dep.) 79:2-8 (CA2984-86, JA2314). Source then

58

obtained a TRO so it could temporarily purchase magazines and preexisting prices. 56.1 ¶¶ 101-103 (CA1451). After it received a TRO, Source negotiated agreements with Time and TWR on the same prices Time had offered in late 2008—the same prices and terms TNG and Ingram accepted in January 2009; the same prices Anderson News repeatedly rejected. *See* Statement of the Case, Section H, *supra*.

Anderson News argues that its "failure to obtain extraordinary judicial relief" in the form of a TRO does not defeat causation (Br. 59), which completely misses the point: Anderson News' failure to seek a TRO, or even ask publishers whether, in view of Source's TRO, Anderson News could receive magazines at preexisting prices, is further, uncontroverted evidence that Anderson News did not want to continue in business at competitive prices and preferred to walk away from its massive indebtedness. Anderson News offers two unsupported reasons why it failed to seek a TRO. *First*, it claims that, unlike Source, Anderson News would face competition for retailer accounts from TNG. (Br. 59.) But competition from TNG is not a consequence of any alleged anticompetitive conspiracy nor is it a harm to competition that gives rise to an "injury of the type the antitrust laws were intended to prevent", *Brunswick Corp.*, 429 U.S. at 489; *see also Virgin Atl. Airways Ltd.*, 257 F.3d at 269. *Second*, it argues that "pursuing a TRO would have undermined [Mr. Anderson's] efforts to save his employees' jobs". (Br. 59.)

59

However, Anderson News offers no reasons why attempting to remain in business at status quo ante prices—or at the improved prices offered by Time and the seven-cents per copy to which Hachette agreed temporarily—would have risked the jobs of Anderson News' employees, and its conclusory assertion is insufficient to withstand summary judgment, *see H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 247 (5th Cir. 1978) ("When the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely."). The necessary implication of Anderson News' argument is that its employees' jobs would have been at risk because Anderson News could not compete at the prices available to it, and Mr. Anderson would conclude that the business was not sustainable.

Anderson News also asserts that Mr. Anderson and TWR (Time's agent and affiliate) reached a deal on January 31, pursuant to which Time would pay Anderson News a price higher than what TNG had already provided in a long-term agreement, 56.1 ¶ 153 (CA1462), and higher than what Anderson News had already accepted from non-conspirator Comag for a 30-day extension, 56.1 ¶ 117 (CA1454). Anderson News then claims Time backed out of the agreement on February 2. (Br. 19.) Although Time and TWR never reached any agreement whatsoever with Anderson News, the existence of that agreement is immaterial. It is undisputed that, even after February 2, when Anderson News acknowledges that

60

it knew no deal with TWR was in place, Anderson News still would not and did not offer pricing terms competitive with those TNG provided to Time or those Anderson News provided to Comag, instead choosing to set into motion the "going dark" plan to foreclose competition and force a higher price. 56.1 ¶¶ 124-30 (CA1456-58). As the district court held, the undisputed evidence showed that Anderson News' downfall resulted from its own "ill-conceived and badly executed plan" and not as the result of any "concerted refusal to deal". (SA3.) The governing law and uncontroverted evidence fully support that conclusion.

Anderson News mistakenly relies on *Publication Paper* for the argument that "courts can 'presume' causation of an injury where 'an act is deemed wrongful because it is believed significantly to increase the risk of [that] injury'". (Br. 57 (quoting *Publ'n Paper*, 690 F.3d at 66).) That "presum[ption]" argument, which Plaintiffs-Appellants forfeited by failing to argue it to the district court, *see generally* S.D.N.Y. ECF No. 386 (JA1568-98), rests upon a misreading of *Publication Paper*.

In *Publication Paper*, the defendants contended that an alleged price-fixing agreement involving a top SENA executive did not cause the plaintiffs' injuries because, they claimed, SENA's decision to raise prices was made before the alleged agreement, *id.* at 69, in accordance with its longstanding history as a "market follower" on prices, *id.* at 67, by persons in "SENA's sales and marketing

department" who were not alleged to have conspired, *id.* This Court found a triable question on causation because of countervailing evidence, including that the allegedly conspiring SENA executive had "final say on *all* pricing decisions", *id.* at 67, that SENA's "market follower" practice was supported by "scant" proof, *id.* at 68, and that SENA did not announce its price increase until after an allegedly conspiratorial phone call, *id.* at 68-69. Importantly, this Court acknowledged that, if proved, the defendants' argument would break the chain of causation. *Id.* at 67-69.

Here, unlike in *Publication Paper*, the break in the causal chain is demonstrated on the undisputed factual record: Mr. Anderson made the decision not to offer or accept the prices of his competitors but instead to liquidate his companies—and he made that decision explicitly because a court order prevented him from cutting off competition. *See Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1142 (2d Cir. 1975) (affirming finding that, where plaintiff had "voluntarily terminated" its business, "there was no causal connection between the alleged antitrust violations and th[e] business decision"); *cf. Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006) ("[P]laintiffs [do not get] access to the federal courts in order to second-guess their poor business judgment."). Mr. Anderson's own decisions—not any purported agreement among publishers and national

62

distributors to reject its above-market price demands—"act[ed] as an intervening cause of the plaintiffs' present commercial woes" and caused it to cease operations, *id*.

## II. ANDERSON SERVICES—AS A SUPPLIER TO ANDERSON NEWS WITHOUT ANY BUSINESS RELATIONSHIP WITH DEFENDANTS-APPELLEES—LACKS ANTITRUST STANDING.

To demonstrate antitrust injury, a plaintiff must show that the injury it suffered is "of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful". *Brunswick Corp.*, 429 U.S. at 489. This Court has held that "a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing". *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir. 1995); *see also Siti-Sites.com v. Verizon Commc'ns, Inc.*, 428 F. App'x 100, 102 (2d Cir. 2011) (summary order). In *G.K.A. Beverage*, the plaintiffs, a group of soft-drink distributors that serviced a bottling company, claimed that the defendants conspired to eliminate both the plaintiffs and the bottling company through conduct alleged to violate the antitrust laws, including forcing the bottling company into bankruptcy, buying its assets and then terminating its distribution agreements with the plaintiffs. 55 F.3d at 766-67. In affirming dismissal, this Court held that the distributors lacked antitrust standing because their injury was "derivative" of the harm to the bankrupt bottler—i.e., it

63

flowed from the termination of the plaintiffs' distributorships rather than from any anticompetitive effect of the defendants' actions. *Id.* at 767; *see also A.G.S. Elecs., Ltd. v. B.S.R. (U.S.A.), Ltd.*, 460 F. Supp. 707, 710 (S.D.N.Y. 1978).

   Here too, any injury Anderson Services suffered was "[m]erely derivative" of its independent business relationship with Anderson News, *G.K.A. Beverage*, 55 F.3d at 766; *see also Anaren Microwave, Inc. v. Loral Corp.*, 49 F.3d 62, 63 (2d Cir. 1995). Anderson Services concedes it had no contracts or other arrangements with any publisher or national distributor apart from the services it provided Anderson News as its vendor. 56.1 ¶¶ 213, 218, 220, 222 (CA1280-83). Anderson News and Anderson Services were separate legal entities that operated separately, with separate finances, separate books and records, and separate employees, facilities, equipment, property and offices. 56.1 ¶¶ 200, 203, 204, 209-211 (CA1277-79). The relationship between Anderson Services and Anderson News was defined by a Distribution Services Agreement ("DSA") negotiated at arm's-length. 56.1 ¶¶ 213, 215 (CA1280-81). Under the DSA, Anderson News' relationships with both retailers and publishers were ███████████ ██████████████ 56.1 ¶ 214 (CA1280). Anderson Services neither purchased magazines from publishers nor resold them to retailers, and it received payments from its own customers, such as Anderson News, not from any Defendant-Appellee. 56.1 ¶¶ 220, 222 (CA1282-83). Any injury Anderson Services

64

purportedly suffered occurred "vis-a-vis" its relationship with Anderson News, not with the alleged wrongdoers. *Int'l Bus. Machines Corp. v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 610 (S.D.N.Y. 2009); *see Siti-Sites.com, Inc. v. Verizon Commc'ns, Inc.*, No. 10 Civ. 3751(DLC), 2010 WL 5392927, at *4 (S.D.N.Y. Dec. 29, 2010), *aff'd*, 428 Fed. App'x 100 (2d Cir. 2011).

Anderson Services was involved in the distribution of magazines in two ways. *First*, Anderson Services was a part-owner of two LLCs, ProLogix (East) and ProLogix (West), which handled the physical distribution of magazines to retailers pursuant to contracts they had with Anderson News and with TNG. *Second*, in the parts of the country where ProLogix did not operate but Anderson News had retail accounts, Anderson Services handled the physical distribution, merchandising and returns processing of magazines for Anderson News.

Anderson Services and ProLogix were paid by Anderson News. Anderson Services lost its income from Anderson News when Mr. Anderson closed Anderson News and Anderson Services. Anderson Services lost its income from ProLogix (East) when Mr. Anderson closed it, and Anderson Services subsequently lost all of its income from ProLogix (East) and (West) when Mr. Anderson sold Anderson Services' interests in those entities to TNG. When Mr. Anderson closed Anderson News, Anderson Services was not the only company to lose income: so, too, did the cleaning company that cleaned Anderson

65

News' offices and the computer company (an affiliate of Anderson News) that provided data processing services to Anderson News. But none of those companies—not Anderson Services, the cleaning company or the computer company—may recover under the antitrust laws, because they all lack antitrust standing, even if they were injured by the demise of Anderson News. For that independent reason, summary judgment was properly entered against Anderson Services.

In the district court, Anderson Services mistakenly relied on cases recognizing antitrust standing of plaintiffs whose injuries are "inextricably intertwined" with the harm the conspiracy causes to competition, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982); *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 294-95 (2d Cir. 1983). In *McCready*, the plaintiff alleged that a group health plan's practice of refusing to reimburse subscribers like plaintiff for psychotherapy performed by psychologists was part of an unlawful conspiracy to restrain competition in the psychotherapy market. 457 U.S. at 467-68. The Court found antitrust injury satisfied because the injury to the plaintiff was the direct means, without any intervening step, that caused the alleged harm to competition in the psychotherapy market, and was thus inextricably intertwined with that harm to competition. *Id.* at 479, 484. Similarly, this Court in *Crimpers* found that a plaintiff trade show, which sought to compete against defendants, had

66

suffered antitrust injury where defendants allegedly conspired to cause a boycott of

its services.  724 F.2d at 291-92, 294-95.  As was the case in *McCready*, the injury

to the *Crimpers* plaintiff was the very means by which the injury to competition

was inflicted and the two were thus inextricably intertwined.  In contrast, the

alleged injury to Anderson Services was not the "very means" by which any injury

to competition was inflicted; rather, Anderson Services was a mere supplier or

vendor to the entity (Anderson News) alleged to have been the victim of a group

boycott.

Anderson News and Anderson Services were affiliated LLCs, but that

fact cannot confer antitrust standing on Anderson Services where none would exist

for an unaffiliated LLC.  An antitrust plaintiff "corporation is not entitled to

establish and use its affiliates' separate legal existence for some purposes, yet have

their separate corporate existence disregarded for its own benefit against third

parties".  *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 820

(7th Cir. 2015) (quoting *Disenos Artisticos E Industriales, S.A. v. Costco

Wholesale Corp.*, 97 F.3d 377, 380 (9th Cir. 1996) (holding plaintiff suffered no

antitrust injury because "the immediate victims of the price fixing were [plaintiff's

corporate] subsidiaries").

Anderson Services' relationship as a "supplier[] to [a] direct market

participant[]" is insufficient to convey antitrust standing on Anderson Services.

67

*Reading Int'l, Inc.*, 317 F. Supp. 2d at 335; *Anaren Microwave*, 49 F.3d at 63. Accordingly, this Court should affirm summary judgment entered against Anderson Services.

## III.  ANDERSON NEWS' AND ANDERSON SERVICES' STATE LAW CLAIMS FAIL.

Anderson News and Anderson Services repackaged their antitrust claim as New York state-law claims of tortious interference and civil conspiracy. Ex. 1 ¶¶ 102-115 (JA98-100).  The district court correctly recognized that the state-law claims depend upon the same evidence and conduct as the antitrust claim, and therefore fail for the same reasons.  (SA46.)

Anderson News and Anderson Services ask this Court to reinstate the state-law claims only "[b]ecause the [district] court's dismissal of [their] state-law claims was based on its rejection of the Sherman Act claim" (Br. 60 (internal quotation marks omitted)), but, as discussed above in Parts I and II, the district court correctly granted summary judgment against their antitrust claims.  Anderson News and Anderson Services do not ask this Court to reinstate their state-law claims independently of their antitrust claims (Br. 59-60), and have accordingly forfeited any argument to that effect, *Hobbs v. County of Westchester*, 397 F.3d 133, 147 (2d Cir. 2005) (deeming abandoned an argument not raised on appeal).

## IV.   COUNTER-CLAIMANTS-CROSS-APPELLANTS SUFFERED ANTITRUST INJURY AS A RESULT OF MR. ANDERSON AND ANDERSON NEWS' CONSPIRACY TO RAISE PRICES.

Mr. Anderson and Anderson News have never challenged the sufficiency of evidence to establish triable issues that they organized a group boycott to coerce publishers into accepting a price increase.  In particular, they never challenged the sufficiency of evidence that they:

1. conspired with Source ███████ to raise the price of magazine distribution by compelling publishers to accede to Anderson News' ultimatum regarding the seven-cent surcharge, CC 56.1 ¶¶ 30-33, 40-56 (CA2972-73, CA2975-78);

2. coordinated a group boycott of publishers by retailers when publishers resisted Anderson News' demands, CC 56.1 ¶¶ 19-29, 64-70 (CA2969-72, CA2980-81);

3. shut down magazine distribution by Anderson News nationwide and unwillingly by TNG throughout the eastern United States when publishers refused to accede, CC 56.1 ¶¶ 71-77 (CA2981-83);

4. locked magazines in warehouses so they could not be delivered and sold, CC 56.1 ¶ 72 (CA2982); and

5. wrongfully withheld payments on due and past-due invoices in an effort to coerce publishers into accepting the price increase, CC 56.1 ¶¶ 82-86 (CA2984-85).

The conspiracy collapsed, but not before the co-conspirators intentionally inflicted significant damage upon Time, Hachette and AMI, in the form of lost sales, unpaid invoices and costs of arranging for alternative distribution.  CC 56.1 ¶¶ 87-102 (CA2985-88).

69

The district court assumed that Mr. Anderson and Anderson News had orchestrated an anticompetitive conspiracy, but held that Time, Hachette and AMI would have suffered the same injuries in the absence a conspiracy and, as a result, lacked antitrust injury: "[I]f Anderson News and Source had independently and unilaterally imposed the seven-cent surcharges, Counterclaim Plaintiffs would still have rejected the [surcharge demands]"; Mr. Anderson would have "go[ne] dark" and withheld payment on Anderson News' invoices; and publishers would have "sustained costs in finding alternative wholesalers for Anderson News and Source". (SA48-49.) This antitrust causation theory was not asserted as a basis for summary judgment, S.D.N.Y. ECF No. 321 (CA827-50), and, as a result, Counter-Claimants-Cross-Appellants had no opportunity in the district court to brief or proffer evidence on this issue.

The district court's assumption that publishers would have suffered the same injuries if Anderson News had exited the wholesaling business in an orderly manner rather than at the denouement of Mr. Anderson's anticompetitive scheme is not supported by the evidence. In furtherance of the conspiracy, Mr. Anderson took calculated steps to maximize the injuries publishers would suffer if they resisted the conspiracy's demands: Anderson News and Source collusively set the same unreasonably short deadline of February 1 in an effort to cause chaos and disrupt alternative delivery arrangements. Margolskee Ex. 1 at

70

ANEWS0151821; Margolskee Ex. 60 at SOURCE_00000021; Margolskee Ex. 68
(JA919, CA1499-1500, JA1660-61). Mr. Anderson shut down ProLogix (East) as
part of the effort to block the distribution of magazines by its competitor TNG,
resulting in lost sales and supply chain disruptions, also in an effort to coerce
acquiescence in the conspiratorial price increase. Had Mr. Anderson simply closed
and not implemented his going dark plan, the magazines at ProLogix (East) and
those scheduled to be delivered there would have been available for distribution by
TNG. CC 56.1 ¶¶ 79-81 (CA2983-84). Instead, Mr. Anderson intentionally
stymied distribution of those magazines and the sales they represented were lost.
Anderson News and Mr. Anderson also enlisted retailers to boycott the magazines
of non-compliant publishers. That too resulted in lost sales. All of those lost sales
flowed directly from the anticompetitive scheme put in place by Mr. Anderson and
Anderson News. They were, in fact, the guts of that scheme. As such, they
constitute antitrust injury.

Mr. Anderson also directed Anderson News to withhold millions of
dollars of payments due to national distributors at the end of January in an effort to
increase pressure on them to capitulate to the conspiracy's demands, and perhaps
to drive some publishers out of business. CC 56.1 ¶¶ 82-86 (CA2984-85).

Each of those injuries was inflicted intentionally on the publishers in a
calculated effort to coerce them to accede to the demands of the conspiracy; they

71

were intertwined with the conspiracy's harm to competition and therefore constitute antitrust injury under *McCready*, 457 U.S. 465. As an "integral . . . aspect of the conspiracy", *id.* at 479, Mr. Anderson and Anderson News attempted to coerce publishers by maximizing the disruption to their businesses if they refused to pay the higher price embedded in the surcharge and the shift of inventory costs. Thus, as in *McCready*, "the heart of [the conspiratorial] scheme was the offer of a Hobson's choice" to publishers, *id.* at 483. Like McCready, publishers refused to "yield to [the conspiracy's] coercive pressure", *id.*, and instead endured the costs the conspirators inflicted in an effort to coerce their acquiescence. Those costs satisfy the requirement of antitrust injury. At a minimum, the issues of whether Mr. Anderson and Anderson News would have behaved identically in the absence of a conspiracy, and which, if any, of the injuries suffered by Time, Hachette and AMI would have been suffered merely from the closure of Anderson News under ordinary circumstances, are issues of fact that no party raised or briefed on summary judgment, and which therefore remain to be tried.

## CONCLUSION

Anderson News and Anderson Services ask this Court to turn the antitrust laws on their head—to reward a business that would not or could not compete at market prices with treble damages. Magazine publishers want

72

consumers to buy their magazines, and want magazines available for sale in many different locations.  Here, Anderson News deprived consumers of magazines—not just by organizing a boycott by its own retail customers, but also by shutting down the operations of its joint venture partner and closest competitor.  Time, TWR and Hachette took different routes to attempt to maximize the distribution of their magazines in the face of Anderson News' demands, threats and boycott.  They offered Anderson News comparable or better terms than Anderson News' competitors received and never refused to deal with Anderson News on terms and prices available to and accepted by its competitors.  On those undisputed facts, as a matter of law, Time, TWR and Hachette cannot be held liable for a group boycott or refusal to deal.  Anderson News and Mr. Anderson, on the other hand, should be held responsible for their admitted attempt at a group boycott in furtherance of a price-fixing conspiracy, and the antitrust injury they intended and successfully inflicted on Time, Hachette and AMI.

The judgment should be affirmed to the extent entered against

Plaintiffs-Appellants and reversed to the extent entered against Counter-Claimants-

Cross-Appellants.

June 14, 2016

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

By

Rowan D. Wilson
Thomas G. Rafferty
Antony L. Ryan

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant-Appellee-*
*Counter-Claimant-Cross-Appellant Time*
*Inc. and Defendant-Appellee*
*Time/Warner Retail Sales & Marketing,*
*Inc.*

74

HEARST CORPORATION OFFICE OF
GENERAL COUNSEL,

By

Jonathan R. Donnellan
Eva M. Saketkoo

*by permission dpn*

300 West 57th Street, 40th Floor
New York, NY 10019
(212) 841-7000

*Attorneys for Defendant-Appellee-
Counter-Claimant-Cross-Appellant
Hearst Communications, Inc. (as
successor-in-interest to Defendant-
Appellee Hachette Filipacchi Media U.S.,
Inc.)*

75

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULES OF APPELLATE PROCEDURE 28.1(E) AND 32(A)

The Final Form Principal and Response Brief of Time Inc.,

Time/Warner Retail Sales & Marketing, Inc. and Hearst Communications, Inc. (as

successor-in-interest to Hachette Filipacchi Media U.S., Inc.) complies with the

16,500 word limit set forth in Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i)

because it contains 16,389 words, excluding the parts of the brief exempted by

Federal Rule of Appellate Procedure 32(a)(7)(B)(iii). That Principal and Response

Brief complies with the typeface and type style requirements of Federal Rules of

Appellate Procedure 32(a)(5)(A) and 32(a)(6) because it has been prepared in a

proportionally spaced typeface (Times New Roman, 14-point).

Dated: June 14, 2016

_____
Rowan D. Wilson

## CERTIFICATE OF SERVICE

I hereby certify that, on June 14, 2016, a copy of the Final Form Principal and Response Brief of Time Inc., Time/Warner Retail Sales & Marketing, Inc. and Hearst Communications, Inc. (as Successor-in-Interest to Hachette Filipacchi Media U.S., Inc.) was served upon counsel for each party by electronic means pursuant to written agreement, Fed. R. App. P. 25(c)(1)(D).

Dated: June 14, 2016

_____
Rowan D. Wilson