REDACTED PUBLIC VERSION

# 15-2714-cv(L)

**15-2889-cv(XAP), 15-2894-cv(XAP), 15-2903-cv(XAP)**

## In the United States Court of Appeals
## for the Second Circuit

———————————

ANDERSON NEWS, L.L.C.,

*Plaintiff-Counter Defendant-*
*Appellant-Cross Appellee*,

[*caption continued on next page*]

---

**REPLY BRIEF OF TIME INC., HEARST COMMUNICATIONS, INC.**
**(AS SUCCESSOR-IN-INTEREST TO HACHETTE FILIPACCHI**
**MEDIA U.S., INC.), AND AMERICAN MEDIA, INC.**
**[FINAL FORM]**

---

On Appeal and Cross-Appeals from a Judgment of
the United States District Court for the Southern District of New York
The Honorable Paul A. Crotty
No. 09-cv-2227(PAC)

Jonathan R. Donnellan
Eva M. Saketkoo
Hearst Corporation
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
(212) 841-7000

*Attorneys for Defendant-Appellee-*
*Counter Claimant-Cross-Appellant*
*Hearst Communications, Inc. (as*
*successor-in-interest to Appellee*
*Hachette Filipacchi Media U.S., Inc.)*

Rowan D. Wilson
Thomas G. Rafferty
Antony L. Ryan
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant-Appellee-*
*Counter Claimant-Cross-Appellant*
*Time Inc. and Defendant-Appellee Time*
*Warner Retail Sales & Marketing, Inc.*

[*appearances continued on next page*]

LLOYD T. WHITAKER, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C.,

*Plaintiff-Appellant,*

v.

AMERICAN MEDIA, INC., TIME INC., HEARST COMMUNICATIONS, INC.,

*Defendants-Counter Claimants-Appellees-Cross Appellants,*

BAUER PUBLISHING CO., LP, CURTIS CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI MEDIA U.S., INC., KABLE DISTRIBUTION SERVICES, INC., RODALE, INC., TIME/WARNER RETAIL SALES & MARKETING, INC.,

*Defendants-Appellees,*

HUDSON NEWS DISTRIBUTORS LLC, THE NEWS GROUP, LP,

*Defendants,*

v.

CHARLES ANDERSON, JR.,

*Counter Defendant-Cross Appellee.*

———————————

David G. Keyko
Eric Fishman
Pillsbury Winthrop Shaw Pittman LLP
    1540 Broadway
        New York, NY 10036
            (212) 858-1000


*Attorneys for Defendant-Appellee-*
*Counter Claimant-Cross-Appellant*
*American Media, Inc. and Defendant-*
*Appellee Distribution Services, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

CITATION CONVENTIONS ..............................................................iv

INTRODUCTION ...............................................................................1

ARGUMENT .......................................................................................2

I.    THE GRANT OF SUMMARY JUDGMENT ON THE COUNTERCLAIMS WAS IMPROPER BOTH SUBSTANTIVELY AND PROCEDURALLY. ........................................................................2

    A.    Mr. Anderson and Anderson News Inflicted Injuries on Counterclaimants in Furtherance of Their Unlawful Conspiracy, in a Manner that Anderson News Itself Could Not Have. ..........................2

    B.    The District Court Granted Summary Judgment on Grounds Not Raised by Anderson News and Mr. Anderson. ...................................8

II.    THERE ARE NO VALID ALTERNATIVE BASES TO AFFIRM SUMMARY JUDGMENT ON THE COUNTERCLAIMS. .......................11

    A.    Counterclaimants Pleaded and Offered Evidence Proving a Viable Group Boycott Claim. ........................................................................11

        1.    Time, Hearst and AMI pleaded an unlawful group boycott. ....12

        2.    Anderson News and Mr. Anderson's group boycott violated the Sherman Act under any antitrust standard—and any contrary argument is unpreserved. ........................................................14

    B.    Time, Hearst and AMI Have Antitrust Standing. ...............................16

    C.    The Counterclaims Against Mr. Anderson are Timely.......................18

CONCLUSION ...................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baskin v. Hawley*, 807 F.2d 1120 (2d Cir. 1986)......................................................24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................20, 22

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ..............................17, 18

*Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290
(2d Cir. 1983)................................................................................................17

*Gatt Commc'ns Inc. v. PMC Assocs., LLC*, 711 F.3d 68
(2d Cir. 2013)................................................................................................18

*In re Merrill Lynch Ltd. Partnership Litigation*, 154 F.3d 56 (2d Cir.
1998) (per curiam) .........................................................................................21

*Koch v. Christies, International PLC*, 699 F.3d 141 (2d Cir. 2012) .......................21

*Marbury Mgmt., Inc. v. Kohn*, 232 F.2d 705 (2d Cir. 1980) ...................................12

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065 (2d Cir. 1988)................19, 20

*Newman v. Warnaco Grp., Inc.*, 335 F.3d 187 (2d Cir. 2003) ..........................19, 20

*Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243
(S.D.N.Y. 1993) ...........................................................................................19

*Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435 (2d Cir.
2006) ..............................................................................................................10

*Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698 (7th Cir. 2014)...........................12

*Ruth v. Unifund CCR Partners*, 604 F.3d 908 (6th Cir. 2010) ...............................21

*Simonton v. Runyon*, 232 F.3d 33 (2d Cir. 2000) ...................................................12

*Stone v. Williams*, 970 F.2d 1043 (2d Cir. 1992)....................................................21

*Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843
(8th Cir. 2014)...............................................................................................12

ii

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)........................................14

*Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318 (2d Cir. 2004)...........20, 22

*Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015) ....................................................11

*Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402 (E.D.N.Y. 2013)................18

## Statutes & Rules

11 U.S.C. § 362 ...........................................................................................................19

15 U.S.C. § 15b ...........................................................................................................18

Clayton Act § 4, 15 U.S.C. § 15 ...............................................................................18

Fed. R. Civ. P. 8(a)(1) ...............................................................................................12

Fed. R. Civ. P. 56(f)(2) .........................................................................................2, 10

S.D.N.Y. L.R. 6.1(b) ..................................................................................................10

Sherman Act §1, 15 U.S.C. § 1 ...........................................................................14, 15

## Other Authorities

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 1805 (3d ed. 2007) ........................................................................................................16

iii

## CITATION CONVENTIONS

| | |
|---|---|
| AMI Br. __ | Confidential Page Proof Brief for Defendant-Counter Claimant-Appellee-Cross-Appellant American Media, Inc. and Defendant-Appellee Distribution Services, Inc. |
| CA__ | Deferred Confidential Joint Appendix. |
| CC 56.1 ¶ __ | Counterclaim-Plaintiffs' Statement of Additional Facts and Response to Counterclaim-Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1. |
| CC SJ Br. __ | Counterclaim-Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment. |
| JA__ | Deferred Joint Appendix. |
| Margolskee Ex. __ | Exhibits attached to the Declaration of Daniel P. Margolskee in Opposition to Counterclaim-Defendants' Motion for Summary Judgment. |
| Resp. Br. __ | Plaintiffs-Appellants' Page-Proof Reply Brief on Appeal and Response Brief on Cross-Appeal. |
| SA__ | Special Appendix. |
| S.D.N.Y. ECF No. | ECF docket entries in *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-cv-2227(PAC) (S.D.N.Y.). |
| Time Br. __ | Principal and Response Brief of Time Inc., Time/Warner Retail Sales & Marketing, Inc., and Hearst Communications, Inc. (as successor-in-interest to Hachette Filipacchi Media U.S., Inc.). |

## INTRODUCTION

A wealth of evidence shows that Mr. Anderson and Anderson News' conspiracy injured counterclaimants Time, Hearst and AMI. The district court mistakenly concluded that the same injuries would have befallen counterclaimants even if Mr. Anderson and Anderson News had not orchestrated a conspiracy, and so it granted summary judgment on the counterclaims. There is a simple reason why the district court did not fully appreciate how the conspiracy caused injury to counterclaimants: In the district court, Mr. Anderson and Anderson News did not put that point in issue. Thus, Time, Hearst and AMI had no reason or opportunity to present contrary argument and evidence to the district court. This Court should reverse the grant of summary judgment on the counterclaim so that, at a minimum, the district court can apply the summary judgment standard to the evidence showing that the injuries suffered by Time, Hearst and AMI are different from any injuries they might have suffered had Anderson News merely ceased operations without entering into a conspiracy whose specific purpose was to inflict greater injury on them than Anderson News could have acting alone. (*See infra* Part I.)

Anderson News and Mr. Anderson also defend the counterclaim judgment on several other grounds upon which the district court did not rule. The alternative bases they raise for affirming the district court are without merit. (*See infra* Part II.)

# ARGUMENT

## I. THE GRANT OF SUMMARY JUDGMENT ON THE COUNTERCLAIMS WAS IMPROPER BOTH SUBSTANTIVELY AND PROCEDURALLY.

The district court's decision and Anderson News and Mr. Anderson's defense of that judgment fail on the merits, because ample evidence exists demonstrating that the injuries Time, Hearst and AMI suffered were caused directly by the conspiracy orchestrated by Anderson News and Mr. Anderson, and not at all what would have transpired had Anderson News merely shut down without participating in a conspiracy. (*See infra* Part I.A.) Reversal is also required for a procedural reason: Anderson News and Mr. Anderson did not raise below the ground on which the district court granted summary judgment on the counterclaim. (Time Br. 69.) Before awarding summary judgment "on grounds not raised by a party", a district court must first give "notice and a reasonable time to respond", Fed. R. Civ. P. 56(f)(2). (*See infra* Part I.B.)

### A. Mr. Anderson and Anderson News Inflicted Injuries on Counterclaimants in Furtherance of Their Unlawful Conspiracy, in a Manner that Anderson News Itself Could Not Have.

For summary judgment purposes, the district court correctly assumed that Mr. Anderson and Source conspired to fix prices. (SA48.) It also correctly assumed that Mr. Anderson had injured counterclaimants, including by "going dark" and withholding past-due payments. (*Id.*) The district court, however, did not appreciate *why* Mr. Anderson inflicted those injuries (and many more):

2

Mr. Anderson's "going dark" plan shutting down TNG's eastern operations as well as his own; his retailer group boycott by which neither Wal-Mart nor Kroger would accept magazines from competitors of Anderson News; his (and Source's) artificially short and inflexible February 1 deadline and coordinated surcharge demand; his withheld invoice payments; and his firms' disruptive closure—all were designed and implemented to inflict much greater injury on publishers to force them to accept his price increases than a mere unilateral decision by Anderson News to cease only its own operations.

If the impact on publishers and national distributors of Anderson News' closure were no different than the impact from its closure coupled with a boycott by Wal-Mart and Kroger, a coordinated price increase with Source, and a forcible shutdown of TNG, Mr. Anderson and Anderson News would have not bothered to orchestrate that conspiracy. The evidence, however, demonstrates that Mr. Anderson and Anderson News did all those things and more, for the express purpose of attempting to crush publishers into submission, where a unilateral threat to close Anderson News would have had no such effect.

At Mr. Anderson's behest, Anderson News and Source agreed to fix prices. Source executives knew about Mr. Anderson's price increase before he announced it and had already decided to match his per-copy surcharge. (Time

3

Br. 18.)  Mr. Anderson and Anderson News do not dispute that for purposes of this

appeal.  (Resp. Br. 70.)

██████████████████████████████ TNG ████

chose to compete on price—so Mr. Anderson consciously foreclosed that

competition by "going dark".  (Time Br. 17-18, 20-21, 25, 30.)  Mr. Anderson

candidly admitted he not only knew but *intended* that his "going dark" plan would

cripple TNG's magazine distribution network.  (*Id*. at 21.)  The disruption to

counterclaimants' business would have been minimized had TNG been able to use

the logistics network it and Anderson News shared.  CC 56.1 ¶ 34-39 (CA2973-

75).  The *reason* Mr. Anderson "went dark" and shut down that logistics network

was to maximize the lost sales and other costs counterclaimants would face in

resisting the price fixed by him and Source.  With that context, for example, it is

clear that the litigation expenses Time later incurred, arising from its attempts to

secure alternative distribution with wholesaler Hudson, are the direct result of the

conspiracy implemented by Mr. Anderson and Anderson News.  (Time Br. 36-37);

CC 56.1 ¶ 95 (CA2987).

      Mr. Anderson also secured commitments from major retailers to back

that price-fixing conspiracy by maximizing the sales publishers would lose by

resisting the price fixed by Mr. Anderson and Source.  Mr. Anderson himself

admitted the reason he solicited retailer commitments was to prevent the

publishers' magazines from being sold in the largest U.S. magazine retailers if those magazines were supplied by wholesalers competing with Anderson News that offered better terms to the publishers than Anderson News did. The evidence demonstrates Mr. Anderson's retailer boycott was not, as he and Anderson News now characterize it, a mere "vertical exclusive dealing arrangement". (Resp. Br. 81-82.) Instead, it was an agreement that, for several weeks, Wal-Mart and Kroger would not sell magazines at all. No consumer benefit—such as improvements in interbrand competition—resulted from the boycott Mr. Anderson orchestrated; instead, consumers were deprived of the opportunity to purchase magazines at thousands of retail locations around the country so that Mr. Anderson, Anderson News and Source could force a price increase they could not achieve unilaterally.

Thus, in September 2008, Anderson News sought to meet with Don Logan, retired CEO of Time Inc., for the purpose of obtaining Time's proprietary information including: what was Time's "[a]vg. ad rate per page", what was Time's "[s]ubscriptions shipping schedule as compared to single copy shipping schedule" and, critically, "*[h]ow many issues would Wal-Mart have to not sell for it to affect People [magazine's advertising] rate base*" (and thus affect People's profitability). CC 56.1 ¶ 23 (CA2970-71); Margolskee Ex. 34 (ANEWS0146779-81) at ANEWS0146779 (emphasis added). Mr. Anderson wanted this information, not to learn how to provide Wal-Mart "superior service" or to "stimulate

5

innovation in the distribution channel" (*but see* Resp. Br. 82), but instead so he could calculate how many weeks he would need to deprive consumers of magazines before he—in combination with the nation's largest retailers of magazines—could cause significant and irreparable damage to Time—and thus force its capitulation to the collusive price increase sought by Anderson News and Source.

Anderson News and Source waited to announce their price hike until mid-January, only a few weeks before their February 1 deadline. That deadline was also calculated by Mr. Anderson and Source to maximize the cost of resisting: with Source joining the conspiracy, it was removed as a competitive alternative to Anderson News, and, by setting such a tight deadline, publishers would have greater difficulty arranging alternative distribution, forcing them to incur a loss of sales that would not have occurred had Anderson News merely shut down its operations.[1] Anderson News also chose a February 1 deadline so that it could withhold from any resisting publisher payment that would otherwise have been

---

[1] Hearst and AMI shipped their monthly magazines to Anderson News—some 780,000 copies, not just a "handful" as Anderson News states (*compare* Time Br. 27 and AMI Br. 8 *with* Resp. Br. 44)—after agreeing to pay the surcharge for those magazines and being assured their magazines would be delivered. Anderson News instead "went dark" in accordance with its plan, did not deliver the magazines and forced Hearst and AMI to sue to recover the magazines so that other wholesalers could eventually try to deliver at least some of the magazines. (Time Br. 27-28, 30.)

made then.  As Jay Maier, the CFO of Anderson News' parent company, wrote

when Mr. Anderson was planning the price hike:

> "Best time to announce to publishers in order to weather the storm
> would be 2-3 weeks prior to publisher payment date to give enough
> time to see publisher action and *then to react by sending no payment
> on the due date*."

Margolskee Ex. 85 at ANEWS0153686 (emphasis added) (JA1704).  When the

time came, Mr. Anderson did just that. ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

   Anderson News and Mr. Anderson made no attempt, on appeal or

below, to dispute those basic facts.  (Resp. Br. 70.)  Nor do they dispute on appeal

that counterclaimants incurred costs resulting at least from Mr. Anderson's "going

dark" plan, his unpaid invoices or his firms' disorderly exit.  (*Id.* at 72, 78.)

Instead, they argue that whatever injuries Mr. Anderson inflicted on

counterclaimants he did "unilaterally" (*id.* at 73, 75-76, 78); they also argue that

nothing "tie[s]" the injuries Mr. Anderson inflicted on counterclaimants to the

anticompetitive agreements he made with Source and major retailers.  (*Id.* at 78.)

Those arguments rest on a willful misunderstanding of the anticompetitive scheme counterclaimants have alleged and will prove. A jury could reasonably conclude the following: Mr. Anderson took calculated steps to inflict the maximum injury on publishers who refused the higher prices he demanded jointly with Source to try to force the price increases on them. It could conclude that those injuries were inflicted in furtherance of the conspiracy and that they cannot fairly be described as "unilateral".

> B. The District Court Granted Summary Judgment on Grounds Not Raised by Anderson News and Mr. Anderson.

Defending the district court's decision, Anderson News and Mr. Anderson mischaracterize both the reasoning it gave and the briefs it considered. It is important to understand exactly what arguments Anderson News and Mr. Anderson raised—and did not raise—in the district court.

Their opening brief below urged three discrete grounds for summary judgment. *First*, they asserted that a price-fixing plaintiff "must prove that its alleged harm results from payment of artificially- increased prices" and that any other injuries, such as lost profits, are too indirect to confer antitrust standing as a matter of law. CC SJ Br. 9-14 (CA839-44). *Second*, they argued below (but not on appeal) that Time was the wrong party to sue for a portion of its injuries that supposedly "were incurred not by [Time directly but instead] by its wholly-owned subsidiary, Time/Warner Retail Sales & Marketing, Inc." ("TWR"). *Id.* at 15-16

8

(CA845-46). *Third*, Mr. Anderson argued that the counterclaims against him were time-barred. *Id.* at 16-19 (CA846-49).

Anderson News and Mr. Anderson inaccurately suggest the district court granted summary judgment on their first ground—that counterclaimants' injuries from the conspiracy were too indirect to confer antitrust standing as a matter of law. (*See* Resp. Br. 71, 72 n.26.) That is not what the district court held. Instead, it found that the conspiracy in fact caused counterclaimants *no* injury—direct, indirect or otherwise. As the district court mistakenly reasoned: "[I]f Anderson News and Source had independently and unilaterally imposed the seven-cent surcharges, Counterclaim Plaintiffs would still have rejected the [surcharge demands]"; Mr. Anderson would have "go[ne] dark" and withheld payment on Anderson News' invoices; and publishers would have "sustained costs in finding alternative wholesalers for Anderson News and Source". (SA49; *see also* Time Br. 69.) Anderson News and Mr. Anderson argued that any plaintiff who does not pay the fixed price lacks antitrust injury; the district court, instead, held that as a matter of fact, Time, Hearst and AMI's injuries were not caused by the alleged conspiracy, and they would have suffered the same injury even in the absence of Mr. Anderson's conspiracy—without giving them the chance to adduce factual evidence on that point.

9

In a footnote in their brief to this Court (Resp. Br. 72 n.26), Anderson News and Mr. Anderson cite a footnote of their reply brief below, S.D.N.Y. ECF No. 424 at 3 n.6, in which they stated:

> "Counterclaim-Plaintiffs' supposed lost profits and switching costs would have been sustained even absent the alleged conspiracy between Anderson and Source. Even if all parties agreed that Anderson had made its proposal unilaterally, the outcome would have been identical. Counterclaim-Plaintiffs still would have refused the proposed pricing terms, and would have incurred the same alleged lost profits and other business expenses in the process of refusing Anderson's proposal and switching to alternative wholesalers."

That reply-brief footnote below was both too late and too conclusory to put causation-in-fact at issue in the motion below: too late because Time, Hearst and AMI had no right to a response, and too conclusory because it cites no record evidence to support the causal chain it hypothesizes. *See* S.D.N.Y. L.R. 6.1(b) (allowing an opening memorandum of law, an opposing memorandum of law and a reply memorandum of law for motions made under Fed. R. Civ. P. Rule 56); Fed. R. Civ. P. 56(f)(2) (judgment independent of the motion may be granted only "after notice and a reasonable time to *respond*" (emphasis added)); *see also Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 446 n.3 (2d Cir. 2006) (concluding that statement in a footnote in a reply brief in the district court "was insufficient to preserve the argument").

10

It was reversible error for the district court to grant summary judgment on that basis without first giving Time, Hearst and AMI an opportunity to respond and adduce proof.  *See Willey v. Kirkpatrick*, 801 F.3d 51, 62, 63 (2d Cir. 2015) (vacating summary judgment decision "to the extent that it exceeded the grounds raised in [the] motion" because "the district court did not provide [plaintiff] with notice that it would consider grounds not raised in the defendants' brief in support of their motion").  Anderson News and Mr. Anderson never dispute that it is reversible error for a district court to grant judgment on a ground not argued to it without first giving an opportunity to respond.

Summary judgment on the counterclaims should be reversed.

## II.  THERE ARE NO VALID ALTERNATIVE BASES TO AFFIRM SUMMARY JUDGMENT ON THE COUNTERCLAIMS.

Anderson News and Mr. Anderson offer several alternative bases to affirm summary judgment on the counterclaims, none of which were adopted by the district court.  Some of those arguments were unpreserved below; all are meritless.  This Court should reject all of them.

### A.  Counterclaimants Pleaded and Offered Evidence Proving a Viable Group Boycott Claim.

Mr. Anderson orchestrated an unlawful group boycott, joined by Source and major retailers, to coerce publishers into accepting prices fixed jointly by Anderson News and Source.  Anderson News and Mr. Anderson argue: (1) that

11

the counterclaims do not plead a group boycott (Resp. Br. 78) and (2) that the

participation of retailers renders the group boycott reasonable as a matter of law,

(*id.* at 79-82).

Both arguments are mistaken (and the second was forfeited for failure

to raise it in the district court). Counterclaimants did plead their group boycott

claim. (*See infra* Part II.A.1.) That group boycott—calculated to enforce a naked

horizontal price fixing agreement—was plainly an unreasonable restraint of trade

(and Cross-Appellees have never before suggested otherwise). (*See infra*

Part II.A.2.)

1. Time, Hearst and AMI pleaded an unlawful group boycott.

A complaint states a claim for relief if it pleads jurisdiction, demands

the relief sought and gives a "short and plain statement of the claim showing that

the pleader is entitled to relief". Fed. R. Civ. P. 8(a)(1). "[G]enerally a complaint

that gives full notice of the circumstances giving rise to the plaintiff's claim for

relief need not also correctly plead the legal theory or theories and statutory basis

supporting the claim." *Simonton v. Runyon*, 232 F.3d 33, 36-37 (2d Cir. 2000)

(quoting *Marbury Mgmt., Inc. v. Kohn*, 232, F.2d 705, 712 n.4 (2d Cir. 1980));

*accord Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014)

("Plaintiffs need only plead facts, not legal theories, in their complaints.");

*Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848 (8th Cir. 2014).

Counterclaimants' group boycott theory easily meets those pleading standards. Anderson News and Mr. Anderson incorrectly argue that the counterclaim includes only "stray references" to the alleged boycott. (Resp. Br. 78.) In fact, counterclaimants in Count One explained their group boycott theory and throughout their complaint pleaded a wealth of facts supporting it. Margolskee Ex. 108 ¶¶ 65-67, 69, 78-80, 88, 90 (CA31-33, CA36-37, CA39-40).

Thus, in Count One, counterclaimants alleged that:

- "[Anderson News and Mr. Anderson] acted in concert with [Source] with the purposes, intent, and effect of unreasonably restraining trade and commerce by coordinating a price-fixed 7-cent per copy surcharge demand, *enforced by concerted refusals to deal if that demand was not immediately met*." *Id.* at ¶ 88 (CA39) (emphasis added).

- "As part of their plan, Counterclaim-Defendants *induced certain large retailers to support the price-fixed surcharge demand by threatening to boycott publishers* that attempted to switch to competing wholesalers that were not part of the conspiracy." *Id.* at ¶ 90 (CA40) (emphasis added).

In summary, the factual allegations supporting the boycott claim included:

- Mr. Anderson met with Wal-Mart and Kroger to solicit their support for his price hike. *Id.* at ¶ 65-66 (CA31-32).

- Wal-Mart and Kroger both agreed to boycott publishers that would not accept Anderson News' surcharge demand. *Id.* at ¶ 67 (CA32).

- Source secured similar pledges of support from Wal-Mart and other major retailers. *Id.* at ¶ 69 (CA33).

- Anderson News, Source, Wal-Mart and Kroger ████████ ████████████████████████████ ████████████████████████ *Id.* at ¶ 78 (CA36).

- Anderson News and Kroger coordinated on a letter threatening to de-list any publisher that refused to accede to the price hike. *Id.* at ¶ 79 (CA36-37).

- Anderson News solicited Wal-Mart to de-list publishers that refused to pay the surcharge demand. *Id.* at ¶ 80 (CA37).

These facts show Time, Hearst and AMI's theory of the case has always been that Anderson News and Mr. Anderson solicited and received support for their price-fixing scheme from competitors and key retailers. For Anderson News and Mr. Anderson to pretend otherwise ignores the facts pleaded throughout the complaint and Count One of the counterclaim complaint.

> 2. Anderson News and Mr. Anderson's group boycott violated the Sherman Act under any antitrust standard—and any contrary argument is unpreserved.

Section 1 of the Sherman Act prohibits agreements that restrain trade unreasonably. *United States v. Apple, Inc.*, 791 F.3d 290, 320-21 (2d Cir. 2015). Although Anderson News and Mr. Anderson argue that Time, Hearst and AMI's counterclaims must be analyzed under the Rule of Reason (Resp. Br. 79-80), it is irrelevant for purposes of this appeal whether the Rule of Reason or *per se* standard applies. There was more than sufficient evidence from which a jury could conclude that the group boycott Mr. Anderson organized was anticompetitive and unreasonable.

14

Anderson News and Mr. Anderson now claim—an argument they never raised below (*see generally* CC SJ Br. (CA827-50))—that their group boycott caused *no* injury to competition and had procompetitive benefits. (Resp. Br. 80-82.) They can advance that argument only by baldly ignoring evidence that Mr. Anderson orchestrated the group boycott, joined by Source and major retailers, for the purpose of coercing publishers into accepting above-market prices fixed jointly by Anderson News and Source. Much of that evidence came from Mr. Anderson's own testimony: he admitted he met with Wal-Mart and Kroger, described his planned price increase, explained how his "going dark" plan would enforce it, and secured their agreement to refuse delivery to force publishers to acquiesce. (Time Br 16-21.) Those agreements are a far cry from the "vertical exclusive dealing agreement" Cross-Appellees suggest. (Resp. Br. 81.) The retailer boycott orchestrated by Mr. Anderson is one in which he planned for the eventuality that publishers might not acquiesce to Anderson News' surcharge demand and inventory cost shift, in which case Anderson News would have no magazines to sell. The circumstance in which Anderson News has no magazines to sell, and conspires with retailers that they will refuse to accept magazines from Anderson News' competitors, so that consumers could not purchase magazines at all, is nothing like an exclusive dealing arrangement. Even if it were, it would be one that "facilitates express collusion" and is condemnable under Sherman Act § 1.

15

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 1805 (3d ed. 2007).

Anderson News and Mr. Anderson suggest that, by marshaling retailers to enforce the alleged price-fixing scheme, they "enable[d] [the] market[] to operate more efficiently", and that "[r]etailers supported Anderson because [of its] superior service, and because [its] surcharge . . . was designed to stimulate innovation". (Resp. Br. 81-82.) These conclusions are—to put it mildly— disputed. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████

██████ a recommendation that would hardly make sense if Anderson News actually provided "efficient[]", "superior service" (Resp. Br. 81-82). Presented with this evidence at trial, a reasonable jury could easily resolve the disputed facts in favor of counterclaimants.

B.    Time, Hearst and AMI Have Antitrust Standing.

Mr. Anderson and Anderson News—in concert with Source and major retailers—took steps calculated to inflict the maximum amount of damage on

16

publishers who refused the price fixed by Anderson News and Source, to try to force publishers into submission. Counterclaimants refused the conspiracy's demand; as a consequence they suffered the damage the conspiracy inflicted in an attempt to coerce them. (*See supra* Part I.B.) As counterclaimants have explained (*see* Time Br. 71), that fact pattern demonstrates their antitrust standing under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 479, 483 (1982). Indeed, counterclaimants' "case is . . . *a fortiori* to McCready's" because injury to the publishers "was the precisely intended consequence of the defendants'" conspiratorial scheme, *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 294-95 (2d Cir. 1983).

      *McCready* is directly on point and Anderson News and Mr. Anderson have no basis on which to distinguish it. The only distinction they attempt to draw is to note that "*McCready* was a boycott case", but counterclaimants have stated a group boycott claim (*see supra* Part II.A), and *McCready* never suggests that its reasoning is limited only to cases presenting concerted refusals to deal.

      Anderson News and Mr. Anderson also mistakenly argue that antitrust standing is lacking here supposedly because a purchaser is "victimized by price fixing" only if it "pay[s] higher prices for a product". (Resp. Br. 72.) That misstates the law. *McCready* squarely held that "an increase in price resulting

17

from a dampening of competitive market forces is . . . *not the only form of injury remediable under*" Clayton Act § 4. 457 U.S. at 482-83 (emphasis added).

The cases Anderson News and Mr. Anderson cite on this point are inapposite: both involve plaintiffs who complained of their inability to *share in the ill-gotten profits* of their competitors' anticompetitive schemes. (*See* Resp. Br. 71-72 (citing *Gatt Commc'ns Inc. v. PMC Assocs., LLC*, 711 F.3d 68 (2d Cir. 2013); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402 (E.D.N.Y. 2013)).) Plainly, the antitrust laws are not concerned "with injuries to *competitors* . . . resulting from their participation in or exile from [anticompetitive] schemes". *Gatt*, 711 F.3d at 77; *see also Yong Ki Hong*, 951 F. Supp. 2d at 417-48 (quoting *Gatt*, 711 F.3d at 77). Equally plainly, Time, Hearst and AMI were not competitors excluded from Mr. Anderson's conspiracy but instead were *customers* who, because they "did not yield to [Mr. Anderson's] coercive pressure [were forced to pay] an increase in the[ir] net cost[s]", *McCready*, 457 U.S. at 483. Those increased costs confer antitrust standing. *Id.* at 483-84.

C.    The Counterclaims Against Mr. Anderson are Timely.

The counterclaims were subject to a four-year limitations period, 15 U.S.C. § 15b. That period was tolled by fraudulent concealment until evidence of

18

Mr. Anderson's scheme was revealed in discovery in February 2013.[2]  As a result, the counterclaims, filed in February 2014 (Resp. Br. 83), are timely.

> A claim is tolled for fraudulent concealment when:

> (1) . . . the defendant concealed from [the plaintiff] the existence of his cause of action, (2) [the plaintiff] remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) [the plaintiff's] continuing ignorance was not attributable to lack of diligence on his part.

*New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  A plaintiff has "[i]nquiry notice" of its claim "only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct."  *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 195 (2d Cir. 2003) (quoting *Nivram Corp. v. Harcourt Brace Jovanovich, Inc.*, 840 F. Supp. 243, 249 (S.D.N.Y. 1993)).

Mr. Anderson never denies that the first two fraudulent concealment elements are satisfied (*see* Resp. Br. 84-86):  Mr. Anderson concealed the conspiracy and counterclaimants remained ignorant of their cause of action at least until discovery commenced in February 2013.  (*See id.* at 84.)  Mr. Anderson contests only the third element, arguing that counterclaimants had inquiry notice from Anderson News and Source's parallel price increases and counterclaimants

---

[2] Anderson News concedes that the counterclaims were timely brought against it by virtue of the automatic-stay tolling provisions contained in the Bankruptcy Code, 11 U.S.C. § 362. Resp. Br. 70 n.25.

failed diligently to investigate Mr. Anderson's conspiracy.  (*See id*. at 84-87.)

Mr. Anderson is mistaken on both counts:  Parallel conduct, standing alone, does

not even "suggest" conspiracy, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57

(2007); much less does parallel conduct give a reasonable plaintiff notice of a

potential claim.  Furthermore, counterclaimants diligently investigated the facts

surrounding Anderson News' collapse, and that investigation would have

uncovered the conspiracy earlier had Anderson News not vigorously resisted it.

*See* CC 56.1 ¶¶ 124-26 (CA2997-99).

          Mr. Anderson's argument begins with a misstatement of the

governing legal standard.  He mistakenly claims a plaintiff has inquiry notice when

aware of the mere "possibility" of a claim (Resp. Br. 85), but this Court has never

adopted such an unforgiving standard.  Tolling ceases, not when a plaintiff

speculates about a "possibl[e]" claim, but rather when "a *reasonable* plaintiff in the

circumstances would have been *aware* of the existence of a cause of action", *Veltri*

*v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004) (emphasis

added); *see also Newman*, 335 F.3d at 195.  Mr. Anderson's cited cases (*see* Resp.

Br. 84-86) are not to the contrary:  in each cited case denying equitable tolling,[3]

there were *facts* available from which a reasonable plaintiff could infer it had a

---

          [3] In *Hendrickson Brothers*, 840 F.2d at 1085, this Court held that the statute of limitations was properly tolled.

20

cause of action; in none was tolling cut short by a plaintiff's subjective awareness of a "possibility" of a claim, absent facts to bring it out of the realm of pure speculation.[4]

      Next, Mr. Anderson mistakenly suggests that in 2009 counterclaimants harbored "suspicions" of collusion sufficient to trigger inquiry notice, but, in fact, the very testimony Mr. Anderson cites (*see* Resp. Br. 85-86) shows the opposite: counterclaimants were aware only of parallel price increases; they could only speculate about the underlying conspiracy revealed years later in discovery. Thus, one witness considered it a "great coincidence" that the Anderson News and Source "charge[s] w[ere] the same" and he "guess[ed]" that it resulted from coordination, Margolskee Ex. 106 at 58:7-60:1 (JA1848); another

---

[4] In particular, Mr. Anderson relies on *Stone v. Williams*, 970 F.2d 1043, 1049 (2d Cir. 1992); *In re Merrill Lynch Ltd. Partnership Litigation*, 154 F.3d 56, 60 (2d Cir. 1998) (per curiam); *Koch v. Christies, International PLC*, 699 F.3d 141, 153 (2d Cir. 2012); and *Ruth v. Unifund CCR Partners*, 604 F.3d 908, 913 (6th Cir. 2010).

In *Stone*, the plaintiff, whose claim was premised on her father's concealed identity, was on inquiry notice as soon as her "adoptive mother . . . told her that Williams, Sr. might be her natural father". 970 F.2d at 1048-49. In *Merrill Lynch*, investors were on inquiry notice as soon as they received "disclosures in the prospectuses and annual reports [that] should have alerted the investors that they had been misled". 154 F.3d at 60. In *Koch*, a purchaser of fraudulent wines was aware of, among other things, comments of experts "cast[ing] serious doubt" on the provenance of the wines. 699 F.3d at 153. And in *Ruth*, the plaintiff's claim was not tolled because, unlike this case, the information necessary to uncover the claim was publicly available, and the plaintiff had reason to review that information. 604 F.3d at 910-14.

thought it an "incredible coincidence" and "odd that they came up with the same exact program", Margolskee Ex. 139 at 99:25-103:8 (JA1938-39); a third characterized Anderson News' and Source's letters as "remarkably similar", Margolskee Ex. 103 at 88:22-89:9 (CA1032-33). Awareness of parallel conduct, without more, "will not suffice" to state a claim and "does not [even] *suggest* conspiracy", *Twombly*, 550 U.S. at 556-57 (emphasis added). As a matter of law, a "reasonable plaintiff" lacks notice of "the existence of [its] cause of action", *Veltri*, 393 F.3d at 323, when it is aware only of "two close-in-time, near-identical price increases" (Resp. Br. 86). At a minimum, such a question should be left for a jury.

     *Finally*, Mr. Anderson argues that counterclaimants failed diligently to investigate their claim during the limitations period (*id*. at 87), but he is mistaken. As Mr. Anderson acknowledges (*id*. at 87), counterclaimants sought in the bankruptcy proceedings discovery concerning the Anderson News collapse including Mr. Anderson's "decision to cease operations abruptly". Anderson News and its affiliates, however, objected to the production of any documents relating to their antitrust claims; they procured, over counterclaimants' objection, a protective order allowing them to withhold such documents by designating them as "Antitrust Confidential"; and they withheld over 6,000 pages of documents on that basis. CC 56.1 ¶¶ 125-26 (CA2998-99).

Conspicuously, Mr. Anderson never disputes that the "Antitrust Confidential" documents contained evidence of his conspiracy or that Anderson News shielded them from production. (*See* Resp. Br. 87-89.) Nor could he. *See, e.g.*, Margolskee Ex. 30 (detailing the lessons Anderson News learned from its last attempted price hike and what needed to change to make the next surcharge demand more successful); ██████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

██████████ Margolskee Ex. 85 at ANEWS0153686 (describing Anderson News' plan to withhold payment from publishers to force them to accede to the surcharge) (JA1626-28, JA1664-65, JA1704). Instead, Mr. Anderson argues that the "bankruptcy-related" requests were "not part of any price-fixing investigation" (Resp. Br. 87), but this argument ignores the nature of the conspiracy counterclaimants alleged. In fact, as counterclaimants explained (Time Br. 3-4, 16-21), an integral part of Mr. Anderson's anticompetitive scheme involved cutting off its competitors' magazine distribution by having Anderson News and Anderson Services "go dark". Thus, by investigating Mr. Anderson's "decision to cease operations abruptly" (*see* Resp. Br. 87), counterclaimants *did* attempt to investigate a critical aspect of the conspiracy—attempts that Anderson News indisputably stymied in the bankruptcy court.

23

Eventually, in October 2012, discovery commenced in the district court below, and counterclaimants promptly served a single discovery request seeking the "Antitrust Confidential" documents. CC 56.1 ¶ 127 (CA2999). Even though those documents had already been collected and produced to the bankruptcy examiner, Anderson News and its affiliates did not produce them to Counterclaim-Plaintiffs in a useable format until February 22, 2013—just a few weeks after, in the absence of tolling, the four-year statute of limitations would have expired. *See id.* ¶ 128 (CA2999-3000).

Mr. Anderson does not deny that counterclaimants made their request as soon as discovery opened (Resp. Br. 89 n.31), that the requested documents contained relevant evidence, or that Anderson News inexplicably failed to produce the documents in useable format for four months—just after the limitations period would have expired in the absence of tolling, *see* CC 56.1 ¶ 128 (CA2999-3000). (Resp. Br. 88-89.) Instead, Mr. Anderson says this "blanket" request "came far too late"—even though he concedes the request was made within the four-year limitations period. (*Id*. at 88-89.)

For years, Mr. Anderson, Anderson News and its affiliates successfully blocked counterclaimants' efforts to obtain access to the relevant facts. Mr. Anderson cannot plausibly argue that Counterclaim-Plaintiffs failed to meet the standard for reasonable diligence. *Cf. Baskin v. Hawley*, 807 F.2d 1120,

24

1131 (2d Cir. 1986) ("It is settled that reasonable diligence does not require a

person to commence a lawsuit in order to procure court-ordered discovery of

concealed facts.").

## CONCLUSION

The judgment dismissing the counterclaims should be reversed.

June 14, 2016

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,

By _____

Rowan D. Wilson
Thomas G. Rafferty
Antony L. Ryan

825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant-Appellee-
Counter-Claimant-Cross-Appellant Time
Inc.*

25

HEARST CORPORATION OFFICE OF
GENERAL COUNSEL,

By _____

Jonathan R. Donnellan
Eva M. Saketkoo  *by permission dpm*

300 West 57th Street, 40th Floor
New York, NY 10019
(212) 841-7000

*Attorneys for Defendant-Appellee-*
*Counter-Claimant-Cross-Appellant*
*Hearst Communications, Inc. (as*
*successor-in-interest to Defendant-*
*Appellee Hachette Filipacchi Media U.S.,*
*Inc.)*

PILLSBURY WINTHROP SHAW
PITTMAN LLP,

By _____

David G. Keyko  *by permission dpm*
Eric Fishman

1540 Broadway
New York, NY 10036
(212) 858-1000

*Attorneys for Defendant-Appellee-*
*Counter Claimant-Cross-Appellant*
*American Media, Inc.*

26

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULES OF APPELLATE PROCEDURE 32(A)

I certify that the Final Form Reply Brief of Time Inc., Hearst

Communications, Inc. (as Successor-in-Interest to Hachette Filipacchi Media

U.S., Inc.) and American Media, Inc. complies with the 7,000 word limit set

forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because it

contains 5,351 words, excluding the parts of the brief exempted by Federal

Rule of Appellate Procedure 32(a)(7)(B)(iii).  That Reply Brief complies

with the typeface and typestyle requirements of Federal Rules of Appellate

Procedure 32(a)(5)(A) and 32(a)(6) because it has been prepared in a

proportionally spaced typeface (Times New Roman, 14-point).

Dated: June 14, 2016

_____
Rowan D. Wilson

**CERTIFICATE OF SERVICE**

I certify that, on June 14, 2016, a copy of the Final Form Reply

Brief of Time Inc., Hearst Communications, Inc. (as Successor-in-Interest to

Hachette Filipacchi Media U.S., Inc.) and American Media, Inc. was served

upon counsel for each party by electronic means pursuant to written

agreement, Fed. R. App. P. 25(c)(1)(D).

Dated: June 14, 2016

Rowan D. Wilson